# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

SEDRICK ROSHUN DECOUD, JR., a/k/a
Rab; Shaun Dee Merced; and
Shaun Vance,
          *Defendant-Appellant.*

No. 04-50318

D.C. No.
CR-02-00063-VAP-
03

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

KENDRA TRICE,
          *Defendant-Appellant.*

No. 04-50374

D.C. No.
CR-02-00063-VAP-
12

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

AUDRA ISRAEL,
          *Defendant-Appellant.*

No. 04-50478

D.C. No.
CR-02-00063-VAP-
8

OPINION

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, District Judge, Presiding

Argued and Submitted
February 13, 2006—Pasadena, California

Filed August 2, 2006

8685

Before: Betty B. Fletcher, Warren J. Ferguson, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Callahan
Dissent by Judge Ferguson

## COUNSEL

Vincent J. Oliver, Los Angeles, California, argued the cause for appellant Decoud.

Gail Ivens, Glendale, California, argued the cause for appellant Trice.

Richard D. Rome, Van Nuys, California, argued the cause for appellant Israel.

Craig H. Missakian, Assistant United States Attorney, argued the cause for the government. With him on the consolidated brief were Debra Wong Yang, United States Attorney for the Central District of California, Thomas P. O'Brien, Assistant United States Attorney, and Nancy Kardon, Assistant United States Attorney.

## OPINION

CALLAHAN, Circuit Judge:

This case involves the Drug Enforcement Administration's ("DEA") investigation and the prosecution of a drug-

trafficking organization in Riverside, California. Sedrick Decoud, Kendra Trice, and Audra Israel (collectively, "the appellants") challenge their convictions and sentences for engaging in a conspiracy to distribute cocaine base and, in Decoud's case, for being a felon in possession of a firearm. They raise a number of issues ranging from the government's non-disclosure of its confidential informant's identity to the district court's dismissal of a juror based on her claimed inability to discharge her duties in light of her religious views. We hold that under the various standards that govern our review, the appellants fail to show that the district court committed reversible error. The government concedes, however, that a limited remand is appropriate to give the district court the opportunity to correct the supervised-release term that it imposed as part of Israel's sentence. Accordingly, we affirm the judgments entered by the district court and remand Israel's sentence for further proceedings.

# I

## A. Conspiracy

The investigation beginning in April 2001 uncovered the appellants' participation in an enterprise that manufactured and distributed cocaine base, otherwise referred to as "crack" cocaine. The organization was run by Cleo Page, Israel's then-boyfriend.

Israel met with drug customers at her home and gave them cocaine base in exchange for money. Israel allowed Page to store drugs at her home and introduced Page to her sister, Trice, as someone who could also sell drugs. From then on, Trice was involved in selling drugs for Page and would deliver cocaine base to buyers at prearranged locations. Decoud was also a member of the organization, selling and manufacturing cocaine base for Page.

**B.  Wiretap**

Six or seven months into its investigation, the government approached the district court with a wiretap application and supportive declaration by a DEA Special Agent ("case agent"), requesting authority to intercept calls to and from a cellular telephone primarily used by Page. In addition to Page, the affidavit named Trice as a principal subject of the investigation. The stated purpose of the wiretap was primarily to investigate an alleged conspiracy to manufacture and distribute controlled substances. The affidavit detailed the probable cause for the wiretap, relying on discoveries made during the pre-wiretap investigation and stating that "Special Agents of the DEA have received information concerning an organized cocaine trafficking and distribution network including[ ] Page . . . and others as yet unknown[ ] from Confidential Sources[.]" The affidavit also explained that the wiretap was necessary because normal investigative procedures had been exhausted and other methods of investigation had already been used by or were unavailable to law enforcement.

On November 28, 2001, the district court authorized the initial interception of wire communications, which began the following day. On December 31, 2001, based on the same affidavit, the district court authorized continued interceptions of Page's cellular telephone through mid-January 2002. The wiretap uncovered evidence of the conspiracy: mainly intercepted phone calls with Page.

**C.  Automobile Search and Firearm Possession**

In a December 7, 2001 intercepted call, Page stated that Decoud was "cooking" cocaine base. The DEA then contacted the California Highway Patrol to ask for help in stopping Decoud's automobile, with the expectation that a stop would be made as long as there was a legitimate, independent basis for doing so.

Later that day, a highway patrol officer traveling with a narcotics canine pulled Decoud over for speeding and having improperly tinted windows. Once stopped, Decoud provided the officer with his driver's license. After running a Department of Motor Vehicles check on Decoud's license, the officer learned that the license had been suspended on account of his failure to appear for a prior violation. The officer arrested Decoud and impounded the automobile pursuant to the California Vehicle Code, which authorizes a peace officer to take possession of a vehicle when the driver has been arrested or cited for driving on a suspended license. CAL. VEH. CODE § 22651(p) (West 2001).

The officer conducted an inventory search of the automobile's contents while Decoud was still present and came across a cooking pot, duct tape, sandwich-size plastic baggies, cellular telephones, cash, and a locked metal briefcase. When asked about the briefcase, Decoud claimed that it did not belong to him and that he did not know how to open it. Decoud further stated that he had borrowed the automobile and that the briefcase belonged to the owner of the automobile. The officer then brought the canine over to the vehicle and the canine "alerted" to the presence of drugs in the briefcase. The officer forced it open and found inside a loaded semi-automatic handgun, a large supply of cocaine base, and a digital scale.

## D.   Pretrial Proceedings

On June 6, 2002, a grand jury returned an eight-count indictment charging the appellants and nine others with various drug- and firearm-related offenses. After the nine other defendants pleaded guilty, the government filed a two-count superseding indictment charging the appellants with conspiring to possess with the intent to distribute and distributing more than 50 grams of cocaine base. Decoud alone was charged in count two with being a felon in possession of a firearm.

The government also filed a motion under Federal Rule of Evidence 404(b) to admit prior felony narcotics convictions for each of the appellants.[1] The government sought to admit Israel's 1990 conviction for possession of cocaine base for sale, along with her 1997 and 2001 convictions for possession of cocaine base. After Israel argued that these convictions were too prejudicial, the trial court tentatively admitted the two more recent convictions and excluded the older conviction.

Decoud filed a motion to suppress the evidence derived through the wiretaps, claiming that the supporting affidavit showed that the DEA had failed to exhaust standard investigative techniques, including its use of informants, before seeking a wiretap.[2] Decoud argued that the affidavit contained material misstatements and omissions relating to the alleged necessity of the wiretap investigation which, if redacted, may have resulted in denial of the wiretap application. The district court held a hearing and denied the motion, concluding that the affidavit "more than adequately explain[s] why the government either did not undertake other methods of investigation or to the extent that they did or they had, why such efforts in all likelihood, would not produce the evidence for which the wiretaps were needed."

Decoud also filed a motion to suppress the evidence that the highway patrol officer seized from him, including the contents of the briefcase. After holding a hearing, the district court issued a written denial of the motion, explaining that the evidence established that (1) there was probable cause for the

---

[1]Rule 404(b) begins by confirming the prohibition on the use of character evidence to prove conforming conduct, but then states that evidence of other crimes is admissible when the evidence is offered to prove something other than character, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" FED. R. EVID. 404(b).

[2]Both Israel and Trice joined Decoud's motion to suppress wiretap evidence.

officer to believe Decoud was speeding and that the tinting on the automobile's windows violated the California Vehicle Code, (2) the officer performed a valid inventory search of the vehicle and that his subjective motivation to conduct the traffic stop " 'play[s] no role in [the] ordinary, probable-cause Fourth Amendment analysis' " (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)), and (3) Decoud lacked standing to object to the search of the briefcase because he denied owning it.

At a pretrial status conference, Israel's counsel made an oral motion for the government to disclose the identity of its confidential source ("CS1"). The wiretap affidavit described CS1 as performing controlled drug buys with Page and two other defendants who had already pleaded guilty. Israel wanted CS1 to testify as a defense witness at trial to show that there was no contact between CS1 and Israel. Although the government did not dispute the lack of contact, Israel argued that she should not be limited to eliciting this fact from the case agent. Recognizing that the lack of contact between CS1 and Israel was undisputed, the court determined that CS1 did not have material testimony, but indicated that it would consider any authority Israel provided in support of her motion.

The following day, Israel filed a written motion for the disclosure of CS1, claiming, without further elaboration, that "testimony from the government's confidential source is not only material to the defendant's trial, but will provide exculpatory evidence relating to her innocence of the charges." The court denied the motion in a minute order, explaining that the motion "only contains an utterly conclusory assertion . . . that the informant's testimony will include unspecified 'exculpatory information' " and that "[t]his is insufficient to meet the threshold requirement of showing that disclosure would be relevant to at least one defense."

## E.  Trial Proceedings

Trial commenced on September 30, 2003. In its case-in-chief, the government called a fingerprint examiner to testify

that prints taken from Israel at the time of her arrest for the instant offense in 2002 matched a set of prints that had been obtained from her in connection with a prior arrest. The examiner did not refer to the origin of the prior prints, which pertained to Israel's 1990 narcotics conviction that the district court had already excluded. The government explained that it would redact the reference to the 1990 charge and conviction and the link to a prior conviction on the fingerprint card. The government did not specifically refer to any of Israel's prior convictions and the 1990 fingerprint card was not admitted in evidence. In addition, the court specifically excluded the 2002 set of fingerprints, reasoning that the fingerprint expert's testimony was sufficient to establish that all of the fingerprints belonged to appellant Israel.

After Israel called a number of witnesses, but before Israel herself testified, it became clear that Israel's theory of the case was that she was a user, not a seller, of drugs. The government renewed its argument that Israel's 1990 conviction for possession of cocaine base for sale should be admitted under Rule 404(b), asserting that Israel "opened the door" by claiming that she was not a drug seller. After extensive argument, the court excluded all of Israel's prior convictions under Rule 404(b).

In response, the government inquired whether the convictions could be used for their impeachment value under Federal Rule of Evidence 609. The court ruled that the government could impeach Israel's testimony with the two more recent (1997 and 2001) convictions. During her direct examination, Israel admitted to both convictions, stating that she was convicted twice for felony narcotics possession because she was using cocaine base.

On October 9, 2003, after seven days of trial, the jury began its deliberations. Later that day, the jury sent a handwritten note by Juror No. 8 and signed by the foreperson requesting clarification of the jury instructions regarding the

conspiracy count. The note specifically read: "It was stated in court that in order [for there] to be a conspiracy[,] the profits have to be shared by the partners in crime, is this true?" Half an hour later, the jury sent a second handwritten note by Juror No. 8 and signed by the foreperson. This note requested a playback of recorded calls "to clarify description and language of defendant Israel's phone conversations."

Immediately after the court responded to these notes, Juror No. 8 sent another handwritten note that read: "Dear Judge[,] Would you please allow me to speak with you privately. I should have maybe said this sooner. I am sorry but I cannot go further until I do. Thank you very much in advance."

The court decided to question the juror in front of the parties and counsel but outside the presence of the other jurors. The juror explained that she had been struggling throughout the trial as to whether she could carry out her duties as a juror and it had become clear that, due to her religious convictions, she was unable to judge any defendant. The following exchange transpired between the court and the juror:

Q: Maybe you could tell me what your concern is[?]

A: Well, I've been wrestling with this ever since it started. I'm to the point now, I can't sleep at night. I'm just — I'm a very religious person, and I have my own set of values and I believe in the Bible. Completely. It is what I live my life by. And I just — I'm to the point I cannot do anything that is going to leave me in a state of unrest. I feel that I shouldn't be here. I don't feel that I should be judging anyone. And I feel, I said well, the judge did ask that question, if there is anyone here very religious. And I should have spoken up then. I can't judge another person. And my Bible states certain

facts that I have to live by and those take precedence. So I wanted to ask, maybe I could be excused and you could ask someone else to judge because I can't do it.

Q: I really appreciate you being — coming forward and telling us this[.] You have done the right thing by bringing these concerns and sending the note in and so I want to thank you for doing that, first of all. I think the question that you are remembering that I asked during voir dire goes something like, do any of you have — you can tell I have asked this question a few times. But that doesn't mean it's just not as important every time. But do any of you have any strongly held religious, philosophical, or moral beliefs that would keep you or prevent you from sitting in judgment o[f] another person? Is that the question you are remembering?

A: Yes, I am.

Q: And as you sit here today, how would you answer that question?

A: I would say, yes, I do.

Q: Do you find that you are unable to deliberate with the other jurors, discuss the evidence and the law?

A: Yes, I do. Because in my studies in the Bible there are certain rules, and their standards are different.

Q: And so you are having — you are finding it impossible to set those standards aside and follow the instructions if there is a conflict?

A:   Yes.

The court then opened up the questioning to counsel. Only Israel's counsel was interested in inquiring further and the following dialogue ensued between Israel's counsel and the juror:

Q:   [H]ave you shared these views with the other jurors during your deliberations?

A:   No, I did not.

Q:   I noticed that . . . today you wrote three of the questions. Have you mentioned any of your feelings or expressed any of your religious feelings to the other jurors concerning these defendants or how they might be judged in the eyes of God or whoever?

A:   No.

* * *

Q:   So at least, in part, you have been willing to discuss the case with the other jurors because you have participated to the degree of writing notes asking for more information; correct?

A:   Yes. Actually, we got started and the Holy Spirit convicted my heart so bad ——

The court interrupted the juror in mid-sentence to instruct her not to share anything about the jury discussions. After acknowledging the court's directive, the juror continued with her response and additional questioning from Israel's counsel followed:

A:   There are scriptures that keep coming into my heart that convicted me. And so that is when I

decided[,] well, you know, I mean, I came because it was my civic duty.

Q: I'm sorry, . . . I didn't hear you.

A: I said I came because I felt it was my civic duty. But then the Holy Ghost convicts me and tells me that I am to come out of the world. And that is the way that I have been taught. And that is the way I try to live every day. And I don't feel, I mean, scripture tells me not to sit in judgment and there are other scriptures that keep coming up in my mind that I know is God's Word. And I have to live by what I know is His Word.

Q: And you did not discuss any of this with any of the other jurors?

A: No.

Q: How about when you wrote this [third] note?

A: I started to and then I thought well, I can talk with the judge first. I started to tell them how I felt, but then I thought it would be better to talk with the judge first.

Q: How far did you get in telling them how you felt?

A: I didn't tell them.

Q: You wrote the note and showed it to your foreperson though?

A: Yes.

Q: Did he express any — or did he ask you any questions about it?

> A:   Yes, he did. But I didn't answer. I told him that
>       I wanted to speak with the judge first.

When counsel's inquiry ended, the judge asked the juror to wait out in the hallway for a few moments. Once the juror exited the courtroom, the court stated that the juror should be excused because she "told us unequivocally that she is unable to deliberate and unable to follow the court's instructions[.]" The court then solicited the perspectives of counsel. Initially there was no objection and Israel's counsel stated that "the court's conclusion is correct." Israel's counsel, however, then asked the court to declare a mistrial because the juror was the only "black person" on the jury and her exclusion would be "grossly unfair" given that all the trial defendants are African-American. When the court asked Israel's counsel whether he had any legal authority to support his argument, he responded "No." Counsel for Decoud noted that the juror appeared to have participated in the jury's deliberation and speculated that perhaps she sought to be excused because she felt "ganged up on" in light of the fact that she was "the only black juror." Counsel for Trice shared the same speculations and told the court that "I have a gut feeling maybe something transpired in there."

The court appreciated the defense's concern but rejected these suggestions, finding "that this juror would have told us [if race was an issue] because . . . of her level of intelligence and articulation." Nonetheless, the court had the juror return to answer an additional question: "Is there anything in the jury room in terms of anything that was said or done by any of the other jurors towards you that brought you in here today with this concern?" She responded "No" and the court dismissed her from the jury with just cause for not being able to discharge her duties. The court commented that the juror's "replies seemed to be extraordinarily . . . articulate, sincere, and well thought through" and that "she indicated very positively that she was not making her request to be excused as a result

of any conduct or anything that was said to her by any other juror."

Without waiving their concerns over the juror's dismissal, the appellants consented to the court's substitution of an alternate juror, and the jury was instructed to "set aside and disregard all past deliberations and begin deliberating anew." The reconstituted jury began its deliberations from scratch and returned unanimous special verdicts against the appellants, finding each guilty on the conspiracy charge. As to Israel and Decoud, the jury specifically found that they had respectively conspired to possess more than 50 grams of cocaine base. The jury also found Decoud guilty on the firearm count.

## F.  Post-verdict Proceedings

The appellants moved for judgments of acquittal and a new trial. Four days before the scheduled hearing on the motions, Decoud filed a motion to further examine the dismissed juror, in which Trice and Israel subsequently joined. Decoud based his request on a declaration signed by Israel and Trice's sister, who was a defense witness at trial. The declaration claimed that the juror approached the sister at a bank a couple of months after the trial and asked what had happened in the case. The declaration also stated that the juror told the sister that the juror had been subjected to severe pressure from some of the other jurors while deliberating. According to the sister, the juror implied that there may have been some racial pressure to get her off the case and that she was a "holdout" for acquittal. The declaration also notes that the juror refused to provide her telephone number, address, or any other form of contact information to the sister.[3]

---

[3]The relevant passage of the declaration states:

> On or about Tuesday, December 02, 2003, while I was at the Wells Fargo Bank in Moreno Valley to do banking business, I saw [the juror]. She also saw me and approached me and asked

After a hearing, the district court denied the motions. In a written order, the court memorialized its ruling on Decoud's motion to further examine the juror, observing that the juror's testimony before the court contradicted the declaration's hearsay assertion that the juror felt pressured and that there might have been racial implications to such pressure. The district court also noted that evidence concerning pressure brought to bear on a juror — whether it be in the form of a written declaration or live testimony — was inadmissible under Federal Rule of Evidence 606(b).

On June 24, 2004, the district court sentenced Decoud to a 20-year prison term on count one, a concurrent 10-year prison term on count two, and a 10-year term of supervised release following his release from custody. On July 26, 2004, the district court sentenced Trice to serve a 10-year prison term followed by an eight-year term of supervised release. On September 27, 2004, the district court sentenced Israel to serve a 10-year prison term followed by a 10-year term of supervised release.

---

me if she knew me because I looked familiar and wondered where she had seen me. I informed [the juror] that I was the sister of Audra Israel and Kendra Trice and that I had been in Court during the trial. [The juror] asked me what had happened in the case and I explained to her [sic]. Without soliciting any information from her, she volunteered that while deliberating, she was subject to severe pressure from some of the other jurors and for that and other reasons, she felt compelled to ask[ ] to be excused. She implied that there might have been some racial implications to pressure her to get off the case. She further told me that she was a holdout for acquittal but was severely pressured by the other jurors and for that reason asked to be excused. She also told me that the jurors had their minds made up from the beginning and in fact did not deliberate when they received the case. [She] did not want to go into detail, but suggested that the defense attorneys contact her. She refused to give me her telephone number or address, but suggested that we go through the Court process to obtain it.

## II

With this background in mind, we consider the appellants' contentions in the order in which they arose, starting with the challenged pretrial rulings and concluding with the appellants' objections to their sentences.

### A. The Wiretap Application

[1] In order to obtain a wiretap, the government must demonstrate, *inter alia*, that normal investigative techniques have been tried and failed or reasonably appear unlikely to succeed or to be too dangerous, and must present a full and complete statement establishing that normal investigative means will not suffice. 18 U.S.C. § 2518(1)(c), (3)(c); *United States v. McGuire*, 307 F.3d 1192, 1197 (9th Cir. 2002). We review the district court's finding of necessity in a wiretap application for abuse of discretion. *United States v. Canales Gomez*, 358 F.3d 1221, 1225 (9th Cir.), *cert. denied sub nom. Fregoso v. United States*, 543 U.S. 908 (2004).

[2] On appeal, Israel restates Decoud's claim that the government failed to establish the necessity for the wiretap. Although Israel challenges the case agent's representations concerning CS1, she does not give this court any reason to doubt those representations. As noted, the case agent's affidavit provided that CS1 would no longer be available to make controlled drug buys because of CS1's prison term.

[3] We have articulated that the necessity requirement does not " 'mandate[ ] that the government organize the release of jailed informants before a wiretap will be authorized[.]' " *United States v. Staves*, 383 F.3d 977, 982 (9th Cir. 2004) (quoting *Canales Gomez*, 358 F.3d at 1226), *cert. denied*, 543 U.S. 1169 (2005). We have further reasoned that "any previous success from the use of confidential informants is even less persuasive [in determining necessity] in the context of an investigation of criminal conspiracy." *Canales Gomez*, 358

F.3d at 1226. Thus, Israel's argument does not present a valid basis to challenge the wiretap.

Israel has similarly failed to present any factual allegations to substantiate her conclusory statement that the pen registers were sufficient or likely to succeed in furthering the government's investigation. In contrast, the case agent's 54-page affidavit noted that because pen registers only supplied identifying information regarding calls made from a particular telephone, the technique would neither establish the identity of the person called nor reveal contents of conversations. The necessity for the wiretap is evaluated in light of the government's need not merely to collect some evidence, but to "develop an effective case against those involved in the conspiracy." *United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir. 1986) (Kennedy, J.); *see also McGuire*, 307 F.3d at 1198-99 (defining "effective case" as "evidence of guilt beyond a reasonable doubt"). Therefore, even if Israel had shown that the pen registers would have been productive to some degree, that showing would not have extinguished the need for the wiretap. *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000).

**[4]** Israel also urges that the government's physical surveillance was beneficial and "could have been continued." This view directly conflicts with the affidavit's statement that on one particular occasion during surveillance, Page left his residence and drove directly to (and confronted) law enforcement agents who were conducting the surveillance. The district court reasonably found that Page's knowledge of the surveillance only increased the necessity for law enforcement to wiretap Page's telephones. Accordingly, the district court did not abuse its discretion in finding a necessity for the wiretap. *Canales Gomez*, 358 F.3d at 1225.

## B.   Automobile Search

Decoud asks us to reverse the district court's denial of his motion to suppress the fruits of the automobile search. We

review the district court's denial of his suppression motion de novo. *United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc). Whether Decoud has standing to assert a Fourth Amendment claim is reviewed de novo, although underlying findings of fact are reviewed for clear error. *United States v. Davis*, 932 F.2d 752, 756 (9th Cir. 1991).

**[5]** Decoud argues that the highway patrol officer's inventory search that led to the discovery of the firearm inside the briefcase violated the Fourth Amendment because the search was not conducted in accordance with any standardized policy and was merely a ruse for general rummaging to find incriminating evidence. Although a briefcase is property in which one may have a Fourth Amendment interest, Decoud fails to appreciate that he gave up any expectation of privacy in the briefcase by unequivocally disclaiming ownership. *See United States v. Nordling*, 804 F.2d 1466, 1469-70 (9th Cir. 1986) (stating that a defendant relinquishes any expectation of privacy after disclaiming interest in the property); *see also United States v. Cella*, 568 F.2d 1266, 1283 (9th Cir. 1977) (explaining that denying ownership of property when questioned constitutes abandonment of that property). As a result, we reject his protestations against the search of the briefcase. *See Abel v. United States*, 362 U.S. 217, 241 (1960) (holding that one who has voluntarily abandoned property cannot subsequently complain about its search and seizure).

## C. Non-severance

We now turn to Decoud's argument that the district court erred in trying him along with Trice and Israel. Almost a year before the government filed the superseding indictment, Trice brought a motion to sever, challenging the joinder of co-defendants in the original indictment. At an October 2002 hearing, the district court denied Trice's motion. It is this ruling that Decoud challenges on appeal.

A district court's denial of a motion to sever is reviewed for an abuse of discretion. *United States v. Pitner*, 307 F.3d 1178,

1181 (9th Cir. 2002). "The test for abuse of discretion by the district court is 'whether a joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial.' " *United States v. Patterson*, 819 F.2d 1495, 1501 (9th Cir. 1987) (quoting *United States v. Abushi*, 682 F.2d 1289, 1296 (9th Cir. 1982)).

Initially, we must determine whether Decoud has waived any challenge to the district court's non-severance determination. Decoud claims that he preserved the issue for appeal by filing his own severance motion. But the district court's docket does not indicate that Decoud filed a severance motion, and the parties do not state that Decoud joined Trice's severance motion. We must therefore conclude that Decoud has waived his challenge to the district court's ruling.

**[6]** Assuming *arguendo* that he filed a severance motion or joined Trice's motion, Decoud has nevertheless waived this issue because he failed to renew a severance request at the close of the government's case-in-chief or at any time during trial. We have held that a defendant waives his right to appeal the denial of his severance motion if he does not renew the motion at the close of evidence. *United States v. Sherwood*, 98 F.3d 402, 409 (9th Cir. 1996) (as amended). The reason for requiring a defendant to renew his severance motion is to "enable[ ] the trial court to assess more accurately whether a joinder is prejudicial at a time when the evidence is fully developed." *United States v. Plache*, 913 F.2d 1375, 1379 (9th Cir. 1990).

A defendant, however, will not be found to have waived his challenge if he can show either that he diligently pursued severance or that renewing the motion would have been an unnecessary formality. *Sherwood*, 98 F.3d at 409. Decoud seeks to come within this exception by claiming that the severance motion was accompanied by the introduction of prejudicial evidence that need not have been raised again at the trial stage of the proceedings. He cites evidence that both

Trice and Israel interacted with Page and were involved in the drug conspiracy. Decoud concludes that the jury likely transferred "the clear guilt of Trice and Israel" to Decoud.

Decoud's theory of prejudice is misconceived. The mere fact that a defendant has a better chance of acquittal if tried separately does not require severance. *See United States v. Jenkins*, 785 F.2d 1387, 1394 (9th Cir. 1986) (holding that, absent a showing of manifest prejudice, a co-conspirator is not entitled to severance by merely suggesting or demonstrating a comparative advantage in separate trials). The inevitable consequence of any joint trial is that the jury will become aware of evidence of one crime while considering a defendant's guilt or innocence of another crime. But this does not amount to an abuse of discretion on the part of the trial court. As the Supreme Court has noted, there is a strong preference in the federal system for joint trials. *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *accord* FED. R. CRIM. P. 8(b) (providing that defendants who are alleged to have participated in the same act of transaction or in the same series of acts or transactions may be indicted and tried together). Furthermore, here the trial court gave limiting instructions for the jury to consider the evidence against each of the appellants and to separately evaluate each one's guilt. *See United States v. Fernandez*, 388 F.3d 1199, 1243 (9th Cir. 2004) (specifying that a district court's limiting instructions for the jury to "evaluate each defendant's guilt separately . . . more than sufficient[ly] guard against the possibility of prejudice to the defendants"). There is no indication that the jury was unable to separately evaluate the case against each trial defendant. Thus, Decoud's severance argument, if not waived, is not meritorious.

## D.   Non-disclosure of Informant

Notwithstanding Israel's acknowledgment that the government's confidential informant, CS1, had no contact with the appellants, Israel contends that the district court abused its discretion in denying disclosure of information about CS1. A

trial court's refusal to compel disclosure of a confidential informant's identity is reviewed for an abuse of discretion. *United States v. Henderson*, 241 F.3d 638, 646 (9th Cir. 2000) (as amended). Non-disclosure is an abuse of discretion when "an informer's identity, or [ ] the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of [the accused's] cause[.]" *Roviaro v. United States*, 353 U.S. 53, 62 (1957). The defendant bears the burden of showing a need for disclosure. *United States v. Wong*, 886 F.2d 252, 256 (9th Cir. 1989).

**[7]** While Israel postulates that CS1 could have testified to a lack of any knowledge about her involvement in the conspiracy, CS1's lack of knowledge on this point was undisputed and could have been elicited at trial through a stipulation or the testimony of the case agent. Also, as the district court observed, such testimony would have been of limited value to Israel, for the informant's non-knowledge would have done little to refute the government's otherwise persuasive evidence of Israel's affirmative involvement in the conspiracy. Furthermore, the government did not rely on CS1 in any aspect of its case against Israel; CS1 was not involved in any transaction contained in her indictment, there is no dispute about the facts to which CS1 could have testified, and the involvement of CS1 in securing the government's wiretap is insufficient to compel disclosure of the informant's identity. *See United States v. Williams*, 898 F.2d 1400, 1402 (9th Cir. 1990).

**[8]** For these reasons, Israel has not carried her burden of proving that the disclosure of the informant's identity is "essential to a fair determination" of her case. *Roviaro*, 353 U.S. at 62. We must therefore conclude that the district court did not abuse its discretion in declining to compel the identification of the confidential informant.

## E.   Evidentiary Rulings

The appellants also question various evidentiary rulings made by the district court during trial. A trial court's evidenti-

ary rulings are generally reviewed for an abuse of discretion. *Old Chief v. United States*, 519 U.S. 172, 174 n.1 (1997); *United States v. Alvarez*, 358 F.3d 1194, 1205 (9th Cir. 2004) (noting a district court's " 'wide discretion' " (quoting *United States v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983))). Under this standard, an evidentiary ruling will be reversed only if such error " 'more likely than not affected the verdict.' " *United States v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004) (quoting *United States v. Angwin*, 271 F.3d 786, 798 (9th Cir. 2001)).

## 1. Fingerprint Expert's Trial Testimony

Israel takes issue with the district court's admission of the fingerprint expert's testimony that the fingerprints taken in connection with Israel's 1990 conviction matched the fingerprints she submitted in 2002. Although the 1990 fingerprint card was never introduced in evidence and the district court excluded the 2002 fingerprints, Israel claims that the district court did not go far enough and should have granted her request to strike the expert's testimony because that testimony was "highly prejudicial" as it linked her to the excluded 1990 conviction.

[9] Israel is mistaken because the fingerprint expert did not inform the jury of her 1990 conviction. The government asked the expert to compare the prints taken at Israel's arrest in 2002 with the fingerprint card from the 1990 conviction, but the source of the card was not disclosed to the jury. The testimony concerning the 1990 fingerprint card was limited to the following exchange between government counsel and the expert:

Q:  What is on page 2?

A:  Page 2 is the 35 prints from the Department of Justice given [sic] the booking number and the date of arrest, when the subject was printed.

Q:   Now, who does page 2 relate to?

A:   This [sic] prints belong to the prints that I com-
     pared to the submitted prints.

Q:   Focusing just on page 2, who do those prints
     belong to?

A:   They belong on [sic] the subject name is Audra
     Rene Trice.

Q:   And did you compare those prints on page 2 to
     the prints that were submitted to you on page 3?

A:   Yes, I did.

Q:   And — did you come to any conclusions?

A:   That it was the same. They were a match and it
     belonged to the same subject.

As this excerpt illustrates, the jury only heard the fingerprint
expert compare fingerprints taken at Israel's 2002 arrest with
fingerprints on another document involving an arrest and con-
clude that the two sets matched. The record shows that the
expert said nothing else. Based on this record, the district
court did not abuse its discretion by declining to strike the
fingerprint-comparison testimony.

   Moreover, assuming that there was error, Israel has failed
to establish that such error more likely than not affected the
jury's verdict. As Israel testified to having been convicted on
two prior occasions, the expert's indication that she had been
previously arrested was not materially prejudicial. We find no
reason to disturb the district court's evidentiary ruling.

## 2. Israel's Prior Convictions

Israel also objects to the district court's decision allowing the government to impeach her testimony with her two prior-possession convictions under Rule 609.[4] She states that these prior convictions bore no relevance to the instant offense of conspiracy and that their prejudicial value greatly outweighed their probative value. The government demurs, asserting that Israel has waived her right to challenge the admission of these prior convictions by testifying about them on direct examination.

**[10]** The government is right. In *Ohler v. United States*, 529 U.S. 753 (2000), the Supreme Court pronounced that a defendant may not appeal an evidentiary ruling allowing the admission of evidence of a prior conviction if the defendant herself introduced the prior conviction, even if the defendant properly objected to the ruling. *Id.* at 760. In *Ohler*, the district court had ruled "that if Ohler testified, [the] prior conviction would be admissible under Rule 609(a)(1)." *Id.* at 755. When the case was before us on direct appeal, we had concluded that the defendant had waived her objection to the admissibility of a prior conviction by introducing evidence of the conviction during her direct examination. 169 F.3d 1200 (9th Cir. 1999). The Supreme Court granted *certiorari*, 528 U.S. 950 (1999), and affirmed our decision.

The Court made it clear that, where tough trial decisions are concerned, a defendant must live with the consequences that flow from his choices. 529 U.S. at 758-59. In *Ohler*, this meant that after trying and failing to keep Rule 609 evidence out, the defendant who preemptively introduced her prior con-

---

[4]When impeaching the testimony of the accused, Rule 609(a)(1) provides that evidence of a prior conviction is admissible if that crime was punishable by imprisonment in excess of one year and if the court determines that the probative value of the evidence outweighs its prejudicial effect. FED. R. EVID. 609(a)(1).

viction to lessen its sting waived her right to challenge the initial ruling on appeal. *Id.*

**[11]** Israel's predicament is the same in all material respects. The record indicates that Israel knew that she had to make the difficult election of whether to reveal or to conceal evidence of her prior conviction on direct examination. She deliberately sought to lessen the impact of the prior conviction by mentioning it in her direct testimony rather than allowing the government to introduce it on cross-examination. *See id.* at 758 (explaining that a defendant may not "short-circuit" the government's right to decide whether to use evidence against her by offering the evidence herself and "still preserve its admission as a claim of error on appeal"). *Ohler* is clear: once a defendant "preemptively introduces evidence of a prior conviction on direct examination[, she] may not on appeal claim that the admission of such evidence was error." *Id.* at 760. We must therefore conclude that Israel has waived the opportunity to appeal this evidentiary ruling.

### 3. Case Agent's Trial Testimony

The case agent testified at trial and provided the jury with background information about the investigation, focusing on the beginning of the investigation in April to July 2001 when CS1 was involved. She described how she used CS1 to gather information about cocaine-base sales in a certain area and also noted the drug purchases that CS1 made from Page and another co-conspirator. Based on the intercepted phone calls and her observations, the case agent also testified about the role played by several co-conspirators, but not about the roles of the appellants here. At several points, the defense objected on grounds of hearsay and lack of foundation. The district court discussed striking certain portions of the testimony, but ultimately did not do so. It did, however, offer to give a limiting jury instruction, should the defense so request, that the case agent's testimony was not admitted for the truth of the

matter asserted. The defense never proposed a limiting instruction, and the court did not provide one *sua sponte*.

Israel now argues that the case agent's background testimony constitutes inadmissible hearsay and lacks proper foundation. Israel claims that this evidence was not within the case agent's personal knowledge and was hearsay relayed by others. This contention is not borne out in the record.

The case agent testified about her direct interactions with CS1, which included participating in surveillance on the transactions to which she testified. In addition, the case agent gave a description of the records she reviewed, such as telephone-subscriber information for numbers called by CS1, and told the jury that she had listened to each one of the approximately 7,000 intercepted calls involved in the case. Further, when it came to identifying the roles various individuals played in the conspiracy, she described the nature of her investigation for each individual.

Israel's objections, on the other hand, lack specificity. Israel does not identify what aspects of the case agent's testimony lack proper foundations or constitute inadmissible hearsay. Israel only alleges in a conclusory manner that the testimony was inadmissible and should have been excluded by the district court. Israel also doesn't explain why she or the other appellants did not take up the district court on its offer to provide the jury with a limiting instruction that could have mitigated, if not negated, Israel's hearsay concerns. Further, she provides no case law or other authority to support her argument. Accordingly, we must conclude that Israel has failed to show that the district court abused its discretion in not limiting the case agent's testimony.

## 4.   Expert Testimony on Drug Codes

Israel next takes issue with the district court's decision to allow the testimony of another witness, the government's

drug expert. She objects to the drug expert's explanation that certain words and phrases caught on tape were actually code for drug deals and drug use.

**[12]** In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court set forth the guiding principle that "under the Rules [of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589. In order to assist the trial courts with this task, the Court suggested a flexible, factor-based approach to analyzing the reliability of expert testimony. *Id.* at 593-95. Although not an exclusive list, these factors include: (1) whether a method can or has been tested; (2) the known or potential rate of error; (3) whether the methods have been subjected to peer review; (4) whether there are standards controlling the technique's operation; and (5) the general acceptance of the method within the relevant community. *Id.* at 593-94.

**[13]** The Court has further held that the trial judge's responsibility to keep unreliable expert testimony from the jury applies to all expert testimony, not only to "scientific" testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999). In other words, this "basic gatekeeping obligation" applies with equal force in cases, such as this one, where "non-scientific" experts wish to relate specialized observations derived from knowledge and experience that is foreign to most jurors. *Id. Kumho Tire* also makes clear that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152. We therefore review the district court's decision not to exclude the government expert's testimony for abuse of discretion that requires reversal only if that decision is " 'manifestly erroneous.' " *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997)).

Prior to the expert's testimony, the district court held a *Daubert* hearing at which the expert explained the methodol-

ogy that he used to interpret each of the handful of disputed words. The expert explained that for words that he had not heard before, he based his interpretation of such words on three factors: (1) his training and experience; (2) each word in the context of the specific phone call; and (3) each phone call in the context of other phone calls that he understood.

Israel expresses doubt over the reliability of the expert's methods of interpretation, specifically disputing the expert's testimony that he knew the meaning of such slang terms as "diznerty," "woop-wop," "weezy," and "shake my speezy." Israel maintains, citing *United States v. Hermanek*, 289 F.3d 1076 (9th Cir. 2002), that the district court erred in admitting the testimony because the court relied solely on the expert's general qualifications without receiving a sufficient explanation of the methods used to arrive at his interpretations of words that he had not previously encountered.

Not so. The defendants in *Hermanek* appealed a district court's decision to allow the government's expert to interpret words and phrases not commonly used in the drug trade that he had not previously heard. 289 F.3d at 1090. The government at trial had described only the expert's method for interpreting words commonly used in the drug trade, words with which the expert was familiar. *Id.* at 1093. We found that the government's explanation "offer[ed] no basis for assessing the reliability of [the expert]'s interpretation of words and phrases encountered for the first time in this case." *Id.* We also expressed concern with the government's offer of proof because "at least one of the words listed on the government's offer under the rubric of 'commonly used' drug terms with which [the expert] was 'familiar' . . . was not familiar to [the expert]." *Id.* We held that the district court improperly relied on the expert's general qualifications without assuring that his interpretations of particular encoded words were supported by reliable methods.[5] *Id.* at 1090. Nonetheless, we concluded that

---

[5]The *Hermanek* panel limited its holding by stating, "[w]e do not hold that a government expert . . . can never be qualified to interpret coded drug

"the error, although serious, was harmless" in consideration of all the other incriminating evidence that was properly before the jury. *Id.* at 1096.

**[14]** Here, in addition to setting forth the expert's experience, the government focused on the expert's methodology for interpreting new encoded words, thereby complying with *Hermanek*.[6] *See id.* at 1094 (noting that the government expert "failed to explain in any detail the knowledge, investigatory facts and evidence he was drawing from"). Thus, the concerns with the government expert's testimony expressed in *Hermanek* are not present here. We resolve that the district court faithfully followed the strictures of *Hermanek* in fulfilling its gatekeeping function under *Daubert* and did not err in allowing the government's expert to testify as to the meaning of the new encoded words.

## F.   Sufficiency of Evidence

We next encounter Decoud and Israel's argument that the district court erred in denying their motions for a judgment of acquittal on the conspiracy charge. They claim that the evidence presented at trial was insufficient to support the jury's verdict.

**[15]** We review claims of insufficient evidence de novo.

conversations using words and phrases experienced for the first time in the prosecution at issue[,]" and that "[t]he advisory committee's note to Rule 702 . . . approves such expert testimony where the 'method used by the agent is the application of extensive experience to analyze the meaning of the conversations.' " *Hermanek*, 289 F.3d at 1096.

[6]For example, the expert gave a lengthy explanation of how he interpreted "diznerty" based on his understanding of a common speaking style in "most black communities" where they "will put an 'e' or 'ez' in words, "such as, 'I'm at his hous*ez*,' something like that. Just as a certain slang, certain words. And here[,] 'di*zne*rty' is just a slang on dirty" (emphasis added).

*United States v. Shipsey*, 363 F.3d 962, 971 n.8 (9th Cir. 2004). In a criminal prosecution, "[t]here is sufficient evidence to support a conviction if, 'viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). To sustain a federal conspiracy conviction, the government must prove " '(1) an agreement to accomplish an illegal objective, (2) coupled with one or more acts in furtherance of the illegal purpose, and (3) the requisite intent necessary to commit the underlying substantive offense.' " *United States v. Chong*, 419 F.3d 1076, 1079 (9th Cir. 2005) (quoting *United States v. Pemberton*, 853 F.2d 730, 733 (9th Cir. 1988)). Once a conspiracy is established, the government can prove a defendant's "knowing participation" with evidence of the defendant's "connection with the conspiracy." *United States v. Delgado*, 357 F.3d 1061, 1066 (9th Cir. 2004).

### 1.  Trial Evidence Against Decoud

Decoud argues that the government failed to present any evidence that he engaged in an agreement to commit a crime with anyone else. He concedes that he "prepared drugs for sale," but maintains that he did so on his own and not as part of any conspiracy. He claims that there was no proof that the money he obtained from sales was distributed to others involved in a conspiracy. He further claims that there was no evidence of him having a telephone conversation with Page or another member of the conspiracy concerning matters of an illegal nature. He questions how he could have had an agreement with others in a conspiracy when there is no evidence that he spoke to anyone in the conspiracy.

The record, however, provides a different account of the evidence. The government introduced several intercepted calls between Page and Decoud in which they discussed cocaine base. For example, in one series of calls, Decoud and

Page discussed a batch of cocaine base that Decoud had prepared for Page to sell to "Capone." Capone had complained about the quality of the drugs and Page and Decoud agreed to replace them. At one point, Page referred to Decoud as "his boy," which the decoding expert translated to mean his partner, associate, or cook. There was evidence that Decoud also met with Capone to deliver the substitute batch. In a later call, made while Decoud was in Page's apartment cooking another batch of cocaine base, Decoud confirmed that he had replaced Capone's drugs. In yet another call, Page told Decoud that his customers were unhappy with the batch of cocaine base that Decoud had cooked and told Decoud to fix another batch. Decoud agreed to do so. The jury also learned of a call where Decoud gave Page step-by-step instructions on how to correct another batch of cocaine base.

**[16]** While it may be true that there was no evidence of Decoud sharing profits, he fails to cite any authority that suggests this fact negates his membership in the conspiracy. The government, on the other hand, cites *United States v. Boswell*, 372 F.2d 781, 783 (4th Cir. 1967), for the proposition that "a sharing of the fruits of the conspiracy has never been held . . . to be an essential element of the offense." Of course, a division of profits may be an integral part of a conspiracy and proof of the same. *Id*. The point, however, is that we know of no authority that holds that evidence of a division of profits is essential for a conviction of conspiracy, and accordingly we may affirm Decoud's conspiracy conviction without evidence that the money obtained from drug sales was distributed to others involved in the conspiracy. *Id*. In light of the overwhelming evidence that Decoud prepared the drugs sold by Page's drug organization, we hold that there was sufficient evidence to support the jury's verdict. *Jackson*, 443 U.S. at 319; *Shipsey*, 363 F.3d at 971 n.8.

## 2.   Trial Evidence Against Israel

Israel also argues that the evidence presented against her was too isolated to link her to the overall conspiracy, analo-

gizing her case to *United States v. Umagat*, 998 F.2d 770 (9th Cir. 1993). In *Umagat*, we held that there was insufficient evidence to permit a trier of fact to impute to two of the defendants the knowledge of a conspiracy to smuggle marijuana. *Id*. at 774. We reasoned that the indictment alleged an overall conspiracy joined after its inception by both defendants and that the evidence showed each defendant was involved in a single transaction which was only a part of the ongoing conspiracy. *Id*. at 773-74. We further noted that the government did not offer any other evidence as to the defendants' knowledge of the conspiracy. *Id*. at 774.

The instant case is readily distinguishable because Israel's involvement was not limited to a single transaction, and the multiple intercepted calls between Israel and Page established Israel's knowledge of the overall conspiracy. The phone calls demonstrate that Israel played a variety of roles in Page's drug distribution business. For instance, in one call, Israel responded to Page's complaint about business losses and offered to introduce Page to her connections in the drug trade. In another call, Israel acted as a go-between for Page, arranging for Trice to sell Page's drugs. The jury also heard calls evidencing that Israel facilitated a drug transaction between Page and Trice, delivered drugs for Page, and stored Page's drugs at her house.

The government also presented the jury with evidence of Israel's participation in a series of calls involving the sale of a quarter kilo of cocaine base for $5,400. At times during those calls, Israel referred to the drugs with various slang words, such as "crumbs" and "little ball," and also expressed the view that the money generated from the sale belonged to her and Page jointly.

[17] The totality of the trial evidence demonstrates that Israel worked with Page in his drug-trafficking operation, shared the profits from the illicit drug sales, knowingly stored crack at her house, met with customers, and, at Page's direc-

tion, took money from customers and delivered drugs to them. Accordingly, there was more than sufficient evidence to support the jury's verdict. *Jackson*, 443 U.S. at 319; *Shipsey*, 363 F.3d at 971 n.8.

## G.   Dismissal of Juror

We now arrive at Israel and Trice's shared contention that they were denied their right to a fair and impartial jury when the district court dismissed Juror No. 8. They also challenge the district court's decision not to hold an evidentiary hearing on the issue in light of their new-trial motions.

### 1.   Invited Error

The government asserts that these claims are waived under the invited-error doctrine because Israel's counsel agreed with the district court's decision to dismiss Juror No. 8 due to her testimony that religious views prevented her from determining a defendant's guilt.[7] The invited-error doctrine does not apply here. First, Israel's counsel in no way invited the "error." Second, on the immediate heels of his concurring statement that the court was "correct" in excusing the juror, Israel's counsel launched into an argument for a mistrial because the juror was "the only black person" on the jury and her exclusion would be "grossly unfair" given that the appellants are all African-American. Counsel for Trice contemporaneously voiced the same concerns. Thus, we perceive no barrier to our review of the claims on their merits.

### 2.   Dismissal for Just Cause

[18] Israel and Trice recognize that religious convictions preventing a juror from rendering a verdict amount to good

---

[7]An error is waived and unreviewable when a defendant both invites the error and affirmatively relinquishes or abandons a known right. *United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997) (en banc).

cause for that juror's dismissal. They argue, however, that Juror No. 8 lied to the district court about her reason for wanting to be excused and that she, in fact, was able to deliberate impartially.

*United States v. Symington*, 195 F.3d 1080 (9th Cir. 1999), on which the appellants rely, concerned a scenario that is very different from the present case. There, on the eighth day of deliberations following a three-month trial, the district court received a note from the jury indicating that " '[o]ne juror has stated their [sic] final opinion prior to review of all counts.' " *Id*. at 1083. The district court sent back a note reminding the jurors "of their duty to participate in deliberations with each other, but emphasizing also that each juror should make up his or her own mind on the charges." *Id*. Several days later, the jury sent another note to the court indicating that one juror "cannot properly participate in the discussion" for various reasons including that juror's "[i]nability to maintain a focus on the subject of discussion[, i]nability to recall topics under discussion[, and r]efusal to discuss views with other jurors." *Id*. The district court then questioned each juror individually. *Id*. at 1083-84. Every juror (except the one that was the subject of the complaint) stated that there was one particular juror who refused to explain her views, stating she did not "have to explain herself to anybody." *Id*. at 1084.

Our decision noted that the "statements of some jurors indicated that their frustration with [the juror] may have derived more from their disagreement with her on the merits of the case, or at least from their dissatisfaction with her defense of her views." *Id*. We also pointed out that the juror "stated that she was prepared to continue deliberating" and "that the other jurors' frustration with her might be because '[she] can't agree with the majority all the time . . . .'" *Id*. Expressing concern over the sanctity of jury deliberations, we held "that if the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the [district] court must not

dismiss the juror.'"**8** *Id.* at 1087 (emphasis in original). Applying this standard, we reversed the judgment of conviction, concluding that "there was a reasonable possibility that [the juror]'s views on the merits of the case provided the impetus for her removal." *Id.* at 1088.

[19] Here, Juror No. 8 asked to be excused because of her religious convictions and, when specifically asked by the judge, she confirmed that there had been no improprieties by the other jurors. *E.g., United States v. Burrous*, 147 F.3d 111, 117 (2d Cir. 1998) (permitting the removal of a juror for just cause due to the juror's indication during deliberation that he is unable to render a verdict because of a "personal religious objection"); *United States v. Geffrard*, 87 F.3d 448, 451 (11th Cir. 1996) (affirming the dismissal of a juror who wrote in a letter to the judge that her religious beliefs made her feel that she could not "live with a verdict of guilty for any of the accused on any of the charges"). As the record amply illustrates, the district court took care in inquiring into the circumstances that gave rise to the juror's request for discharge, making sure that there was no reasonable possibility that the juror harbored some other reason for discharge, such as her views on the merits of the case. When defense counsel questioned the juror, once again there was absolutely nothing to suggest that the juror's problem stemmed from anything other than her observance of religion. Indeed, defense counsel remarked that the court was "correct" in dismissing her. Because substantial evidence supports the district court's assessment that the juror was unable to further deliberate and

---

**8**We clarified in *Symington* that "the standard is any *reasonable* possibility, not any possibility whatever." *Symington*, 195 F.3d at 1087 n.5 (emphasis in original). Understanding that " 'anything is possible in a world of quantum mechanics[,]' " we purposefully avoided fixing a standard that would "prohibit juror dismissal [only where] there is no possibility at all that the juror was dismissed because of her position on the merits[.]" *Id.* (quoting *United States v. Watkins*, 983 F.2d 1413, 1424 (7th Cir. 1993) (Easterbrook, J., dissenting)). As we observed, such an unattainable standard would "prohibit dismissal in all cases." *Id.*

perform her duties as a member of the jury, we find no error in the district court's dismissal of the juror.[9]

### 3.  Post-verdict Challenge to Juror's Dismissal

In addition, Israel and Trice claim that they were entitled to a post-verdict evidentiary hearing with the dismissed juror present in light of the declaration that their sister submitted before sentencing. As noted, the sister declared that she had coincidentally run into the dismissed juror at a bank and believed that the juror had implied that racial motivations factored into her desire to be excused from the jury and that she had been a holdout for acquittal.

[20] We review a district court's denial of an evidentiary hearing concerning a dismissed juror for an abuse of discretion. *United States v. Saya*, 247 F.3d 929, 934 (9th Cir. 2001). A district court is not required to hold an evidentiary hearing upon every allegation of juror misconduct, and in determining whether to hold a hearing, it should consider the content of

---

[9]Moreover, the district court was in the best position to evaluate the juror's credibility when she stated that her religious convictions prevented her from deliberating in the case. *See United States v. Beard*, 161 F.3d 1190, 1194 (9th Cir. 1998) (stressing that the decision to excuse a juror is committed to the district court's discretion and must be affirmed unless the appeals court is left with the definite and firm conviction that the district court committed a clear error of judgment); *accord Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 871 (9th Cir. 2001) (giving "great deference to district court findings relating to credibility" and conferring " 'even greater deference' " when the factual findings rest on credibility determinations (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985))). As noted, Juror No. 8 in no uncertain terms told the judge that the jurors had not said or done anything to motivate her request to be excused from the jury. The district court believed the juror's testimony to be extraordinarily articulate and sincere, and found that she entertained no undisclosed pretext. We conclude that the district court acted entirely within its discretion in believing the juror's stated reason for dismissal. *Id.*; *see also Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (permitting a juror's discharge for cause if a particular belief prevents or substantially impairs the performance of the juror's duties).

the allegations, the seriousness of the alleged misconduct, and the credibility of the source. *Id.* at 934-35.

In the case at bar, at the hearing on the new-trial motions, the defense requested that the court arrange for the dismissed juror to be present for further examination. The district court declined to do so for two independent reasons. First, it noted that counsel already had an opportunity to question the juror at the time when she sought to be discharged from the jury. Second, the court held that a further inquiry into the juror's participation in the jury's deliberations would be improper under Rule 606(b).[10]

On appeal, Trice and Israel do not argue that the district court abused its discretion in denying a hearing based on its and counsel's previous examination of the juror. Rather, they focus their challenge on the district court's Rule 606(b) rationale. Trice argues that Rule 606(b) does not prohibit jurors from testifying about evidence of racial bias and relies on *United States v. Henley*, 238 F.3d 1111, 1120 (9th Cir. 2001).

Although *Henley* implied in dictum that evidence of racial prejudice might be exempt from Rule 606(b)'s restriction on post-trial evidence, 238 F.3d at 1120-21, *Henley* was specifi-

---

[10]Rule 606(b) provides in relevant part:

> Upon an inquiry into the validity of a verdict . . . , a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or . . . concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may . . . evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

FED. R. EVID. 606(b).

cally referring to racial bias " 'unrelated to the specific issues that the juror was called upon to decide.' " *Id.* at 1120 (quoting *Rushen v. Spain*, 464 U.S. 114, 121 n.5 (1983) (*per curiam*)); *see also Williams v. Price*, 343 F.3d 223, 237 (3d Cir. 2003) (Alito, J.) (detecting *Henley*'s "dictum" and pointing out that "[t]he actual holding in *Henley* did not concern racial bias"). Indeed, *Henley* presented an instance where a juror made racist remarks while carpooling to and from the trial. *Henley*, 238 F.3d at 1114. Here, to the extent that the sister's declaration alluded to racial matters, it did not reflect evidence of racial bias against the defendants and related purely to the dismissed juror's position on the merits of the defendants' guilt or innocence.[11] There was no allegation of racial epithets indicating a racially-biased juror, as there had been in *Henley*. *Id.*; *cf. United States v. Heller*, 785 F.2d 1524, 1527 (11th Cir. 1986) (concluding that ethnic bias warranted a mistrial upon discovery that deliberations consisted of numerous anti-Semitic slurs and jokes made by a juror about the Jewish defendant that were met with "gales of laughter"). Rather, at most the declaration claimed that the dismissed juror "implied" that she felt racial pressure because she was a "holdout." While the dismissed juror and the appellants are African-American, this fact alone does not warrant piercing the secrecy and sanctity of jury deliberations or disrupting the finality of the process. *See Brewer v. Hall*, 378 F.3d 952, 956 (9th Cir.) (citing *Remmer v. United States*, 350 U.S. 377, 382

---

[11]Rule 606(b) clearly bars consideration of the declaration's allegation that the juror said that she was subjected to pressure by other jurors for being a "holdout for acquittal." *See United States v. Briggs*, 291 F.3d 958, 961 (7th Cir. 2002) (barring evidence of one juror being " 'intimidated' by other jurors into finding [the defendant] guilty"); *see also United States v. Brito*, 136 F.3d 397, 414 (5th Cir. 1998) (deeming evidence of internal coercion inadmissible per Rule 606(b)); *United States v. Tallman*, 952 F.2d 164, 167 (8th Cir. 1991) ("To admit proof of contentiousness and conflict to impeach a verdict under Rule 606(b) would be to eviscerate the rule."); *United States v. Norton*, 867 F.2d 1354, 1366 (11th Cir. 1989) (noting that "alleged harassment or intimidation of one juror by another would not be competent evidence to impeach the guilty verdict").

(1956) (instructing that "it is the law's objective to guard jealously the sanctity of the jury's right to operate as freely as possible from outside unauthorized intrusions")), *cert. denied*, 543 U.S. 1037 (2004). The sanctity of the jurors' deliberations would be seriously compromised if they were subject to postverdict examination because a juror, who did not participate in the verdict, felt some racial pressure when she successfully sought discharge on a distinct and adequate ground.

What is more, if Rule 606(b) is removed from the consideration of the appellants' motions for a new trial, the inadequacy of the declaration is still apparent. Indeed, the speculative and vague nature of the declaration precludes a finding that the district court abused its discretion. In *Fields v. Woodford*, we rejected a defendant's claim that several jurors were racially prejudiced against him because "assuming that the declarations upon which he relies are admissible, they are vague and speculative; they do not show that any racist statements were made." 315 F.3d 1062, 1063 (9th Cir. 2002) (as amended). *Fields* compared the "lack of any *substantial* evidence" before it to other cases finding sufficiently weighty evidence: *Henley*, 238 F.3d at 1114, in which a juror had declared that "the niggers are guilty," and *Tobias v. Smith*, 468 F. Supp. 1287, 1289-90 (W.D.N.Y. 1979), in which the jury foreperson had stated "[y]ou can't tell one black from another." *Fields*, 315 F.3d at 1063 (emphasis added).

**[21]** As in *Fields*, the declaration at issue neither alleges that any racist statements were made nor provides "substantial evidence" that any of the jurors were racially prejudiced against the appellants. *Id*. at 1062. The declaration sets forth only the sister's belief that the dismissed juror "implied that there might have been some racial implications to pressure her to get off the case." In view of the declarant's obvious bias in favor of her sisters (Israel and Trice), the fact that her trial testimony appears to have been rejected by the jury,[12] and

---

[12]The district court may have doubted the sister's credibility because she had testified at trial that her sisters would never have anything to do with drugs, a perspective that the jury obviously rejected.

Juror No. 8's thorough examination and contrary testimony at the time of her discharge when deliberation events were fresh in her mind, we conclude that the district court did not abuse its discretion in declining an evidentiary hearing. *See United States v. Shyrock*, 342 F.3d 948, 974 (9th Cir. 2003) (upholding district court's refusal to conduct a further evidentiary hearing based on its finding regarding the affected juror's credibility), *cert. denied*, 541 U.S. 965 (2004).

Trice also attempts to liken her case to *United States v. Brande*, 329 F.3d 1173 (9th Cir. 2003). That case involved one juror reporting post-trial that another juror, after expressing the view that he was unable to find anyone guilty on account of personal religious beliefs, had been approached by district court personnel and questioned about whether he would be able to find a defendant guilty of a crime. *Id.* at 1175. The juror stated that he would. *Id.* In remanding for an evidentiary hearing, we emphasized that the credibility of the allegation was not in doubt, the juror's susceptibility to improper influence was heightened because the contact involved a court officer, and there was no opportunity to address the *ex parte* contact at trial because it came to light only after the verdict. *Id.* at 1177.

**[22]** Several of the critical factors in *Brande* are absent here. First, Juror No. 8 was not a member of the jury that convicted the appellants. Second, Juror No. 8 was not approached by a court officer or anyone from the government. Third, as we have already noted, the sister's declaration is speculative at best. Finally, unlike *Brande*, Juror No. 8's dismissal was fully considered by the trial judge before the jury — with a substituted alternate juror — convicted the appellants. Thus, even if the declaration were admissible under Rule 606(b), the district court did not abuse its discretion in declining to hold an evidentiary hearing.[13]

---

[13]Contrary to some language in the dissent, we do not condone racial prejudice within a jury. Rather, conscious of our role as an appellate court,

## H.  Sentencing Issues

Finally, we reach the appellants' various challenges to their respective sentences.

### 1.  *Booker* Claims

Decoud claims error under *United States v. Booker*, 543 U.S. 220 (2005), arguing that the district court wrongly based his sentence on a judge-made finding that his conspiracy offense involved cocaine base rather than what he alleges to be powder cocaine.[14] Decoud also complains that the judge determined the amount of drugs attributed to him. Employing a similar rationale, Trice argues that the district court should not have relied on one of her prior convictions to enhance her sentence because she had not admitted to the fact of that prior conviction nor was it found by a jury. We review these claims

---

we hold that the district judge did not abuse her discretion in determining that the appellants failed to make a sufficient showing of possible racial bias to warrant an evidentiary hearing. The district court had before it only an affidavit by a sister of two of the appellants. The sister alleged that during a chance encounter over two months after the trial, the dismissed juror had "implied that there might have been some racial implications to pressure her to get off the case," and had suggested "that the defense attorneys contact her." The record contains no affidavit from either the dismissed juror or defense counsel. On this record, we are forced to conclude that the district judge — mindful of the dismissed juror's firmly expressed reason for being excused and her specific denial that any other juror had influenced her decision to seek to be excused, and of the potential impropriety of questioning jurors about the content of their deliberations — did not abuse her discretion in declining to hold an evidentiary hearing.

[14]While this appeal was pending, the Supreme Court handed down its decision in *Booker*, holding that the federal sentencing guidelines as constituted violated a defendant's Sixth Amendment right to a jury trial. 543 U.S. at 245. That outcome followed from the conclusion that, in a mandatory sentencing regime, the Sixth Amendment precludes a judge from enhancing a sentence beyond the statutory maximum based on facts that are not found by a jury or admitted by the defendant. *Id*. at 232. The Court, however, remedied the perceived constitutional infirmity by rendering the guidelines merely advisory rather than mandatory. *Id*. at 245.

for plain error. *See United States v. Ameline*, 409 F.3d 1073, 1084 (2005) ("If an eligible party seeks resentencing under *Booker*[ ], we will then engage in the plain error analysis[.]").

Decoud's sentencing challenge is not well taken because it is based on the false premise that a judicial finding enhanced his sentence. The record unmistakably reveals that Decoud was sentenced on the jury's special verdict, which found beyond a reasonable doubt that Decoud conspired to possess for purposes of distribution more than 50 grams of a mixture containing cocaine base. This finding, combined with Decoud's prior felony drug conviction, authorized the mandatory-minimum sentence of 20-years imprisonment. *See* 21 U.S.C. § 841(b)(1)(A)(iii) (mandating a minimum sentence of 20 years for a second-time offender who is convicted of participating in a narcotics transaction involving at least 50 grams of cocaine base). Moreover, we have determined that "*Booker* does not bear on mandatory minimums[.]"[15] *United States v. Cardenas*, 405 F.3d 1046, 1048 (9th Cir. 2005).

With respect to Trice's sentencing challenge, she acknowledges that existing law forecloses her argument but nonetheless seeks to assert her position. She correctly notes that *Booker* specifically exempted prior convictions from the category of enhancing facts that "must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*,

---

[15]Decoud also objects to the sentencing enhancement he received for possessing a firearm in relation to the drug offenses with which he was charged. He argues that there was no basis for this enhancement in the jury's verdict. Any *Booker* error that may have occurred, however, was harmless, as the statutory minimum would have applied to Decoud regardless of the enhancement for possession. *United States v. Cardenas*, 405 F.3d 1046, 1048 (9th Cir. 2005); *see also United States v. Ameline*, 409 F.3d 1073, 1084 (9th Cir. 2005) (en banc) (noting that a remand is necessary to correct *Booker* errors only "where it is not possible to reliably determine from the record whether the sentence imposed would have been materially different had the district court known that the Guidelines were advisory").

543 U.S. at 244. This court has held the same, observing that *Booker* does not affect sentencing enhancements based on the fact of a prior conviction. *United States v. Delaney*, 427 F.3d 1224, 1226 (9th Cir. 2005). Accordingly, Trice's argument fails under the weight of this authority.

## 2. Limited Remand

Israel seeks a limited remand for the district court to correct an error regarding her term of supervised release even though she did not raise the issue below. She notes that the district court sentenced her to a supervised-release term of 10 years based on a prior conviction that the government withdrew. She asserts that the proper term is five years.

**[23]** When a defendant raises an issue on appeal that was not presented to the district court, the court of appeals may review only for plain error. FED. R. CRIM. P. 52(b); *see also United States v. Jordan*, 256 F.3d 922, 926 (9th Cir. 2001) (reviewing for plain error a challenge to sentencing that the defendant did not raise before the district court). Here, however, the government concedes that it withdrew the prior conviction and has no objection to our vacating Israel's term of supervised release and allowing the requested remand. Accordingly, a limited remand appears appropriate to afford the district court an opportunity to reconsider Israel's supervised-release term.

## III

For all of the foregoing reasons, the appellants' convictions and sentences are **AFFIRMED** and appellant Israel's sentence is **REMANDED** for reconsideration of her supervised-release term.

FERGUSON, Circuit Judge, dissenting:

I respectfully dissent from the majority's approval of the District Court's failure to hold an evidentiary hearing regarding whether racial bias infected the jury that sat in judgment of Appellants Israel and Trice. *See* maj. op. at 8725-29.

Appellants Israel and Trice are both African-American. The original jury impaneled in their case had only one African-American member, Juror No. 8. This same juror, after a day of deliberations, asked to be dismissed. She claimed she could not continue to deliberate, despite the fact that she had been actively participating in deliberations and sending out questions to the Judge up until that point, because her religious beliefs prevented her from sitting in judgment of another person. The District Court accepted Juror No. 8's explanation and dismissed her. An alternate juror, who is not African-American, was then impaneled. The jury began deliberations anew, eventually finding each Appellant guilty of the charges against her.

After the Appellants were convicted, they moved for a new trial based on an affidavit submitted by their sister, Shondra White. According to the affidavit, a couple months after the trial, while in a local bank, White was approached by Juror No. 8, who recognized White from the trial. After White identified herself, Juror No. 8 told White she had been subject to severe pressure in the jury room, and that pressure, not her religious beliefs, led her to ask to be dismissed. According to White, Juror No. 8 "implied that there might have been some racial implications to pressure her to get off the case." Despite this troubling information, the District Court denied the Appellants' request for an evidentiary hearing to further question Juror No. 8 regarding what role, if any, racial prejudice played in the jury deliberations.

I dissent on two grounds. First, the majority misconstrues *United States v. Henley*, 238 F.3d 1111 (9th Cir. 2001), which

persuasively reasons that racial prejudice is a mental bias that is *never* acceptable in the jury room. Instead of disregarding *Henley*, we should apply its reasoning to hold that Federal Rule of Evidence 606(b) does not bar testimony regarding evidence of racial prejudice within the jury. Second, White's affidavit, combined with the circumstances of Juror No. 8's dismissal, sufficiently raises the prospect that the jury may have been tainted by racial bias to require an evidentiary hearing on the matter. If called to testify, Juror No. 8 may confirm that nothing untoward occurred during deliberations. Until such an evidentiary hearing is held, however, the specter of racial prejudice hangs over the trial and undermines public confidence in the verdict. *See Developments in the Law — Race and the Criminal Process: VII. Racist Juror Misconduct During Deliberations*, 101 Harvard L. Rev. 1595, 1600 (1988) ("Permitting defendants to expose racially tainted deliberations gives the public—particularly minority citizens—more reason, not less, to trust the final results of the criminal justice system.").

I.

We refuse to be a society in which a defendant's guilt or innocence is decided by the color of her skin. Accordingly, the Sixth Amendment entitles every defendant to an impartial, unbiased jury. *See Henley*, 238 F.3d at 1120. We have held that the Sixth Amendment is violated by "the bias or prejudice of even a single juror." *Id.* (quoting *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998)). The danger caused by such bias or prejudice, and the need to take extra measures to protect against it, has been repeatedly recognized. *See, e.g.*, *Turner v. Murray*, 476 U.S. 28, 35-36 (1986); *Batson v. Kentucky*, 476 U.S. 79 (1986).

To be consistent "with the broad goal of eliminating racial prejudice from the judicial system," evidence of racial bias within jury deliberations should be admissible. *Henley*, 238 F.3d at 1120. The majority, however, would use Rule 606(b)

to prohibit the introduction of some evidence of racial preju-
dice. This is inconsistent with the Supreme Court's holding
that, despite Rule 606(b), "[a] juror may testify concerning
any mental bias in matters unrelated to the specific issues that
the juror was called upon to decide . . . ." *Id.* (quoting *Rushen
v. Spain*, 464 U.S. 114, 121 n.5 (1983)). In *Henley* we cor-
rectly reasoned that Rule 606(b)'s general bar on inquiry into
the deliberations of the jury does not apply to testimony relat-
ing to racial prejudice because "[r]acial prejudice is plainly a
mental bias that is unrelated to any specific issue that a juror
in a criminal case may legitimately be called upon to deter-
mine." *Henley*, 238 F.3d at 1120.[1]

The majority attempts to distinguish the present case from
*Henley* by arguing that "to the extent that [White's] declara-
tion alluded to racial matters, it did not reflect evidence of
racial bias against the defendants and related purely to the dis-
missed juror's position on the merits of the defendants' guilt
or innocence." Maj. op. at 8727. The majority apparently
would allow racial prejudice within the jury as long as there
is no explicit evidence that the bias was directed at the defen-
dants. Such a position is untenable, and violates the basic
premise that racial bias should never play a role in the
decision-making process of a jury. If the prejudice of other
members of the jury forced Juror No. 8., who was inclined to
vote for acquittal, off the case, then that prejudice is no less
troubling than racial bias aimed directly at the defendants
because such prejudice effectively decided the outcome of the
case. Furthermore, if the racial prejudice present in the jury
room was strong enough to pressure a fellow juror to seek dis-
missal, it is very likely such bias also invaded the remaining

---

[1]Racial bias may also be characterized as "extraneous prejudicial infor-
mation" that has an effect on the jury. By its own terms, Rule 606(b)
admits such evidence. Fed. R. Evid. 606(b) ("except that a juror may tes-
tify on the question whether extraneous prejudicial information was
improperly brought to the jury's attention"); *see also Henley*, 238 F.3d at
1120; *Tobias v. Smith*, 468 F. Supp. 1287, 1290 (W.D.N.Y. 1979).

jurors' deliberations regarding the African-American defendants.

*Henley* dictates the result in this case. We should hold that Rule 606(b) does not bar the admission of juror testimony and other evidence regarding racial prejudice within the jury.

## II.

Based on White's declaration and the circumstances of Juror No. 8's dismissal, the Appellants are entitled to an evidentiary hearing regarding the existence and extent of racial bias within their jury.

In determining whether to hold a hearing, a district court "must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source." *United States v. Saya*, 247 F.3d 929, 935 (9th Cir. 2001). Holding an evidentiary hearing is "usually preferable," unless "the court [knows] the exact scope and nature of the . . . extraneous information." *Id.* (internal quotation marks and citation omitted).

Here, the seriousness of the alleged misconduct, racial prejudice within the jury, weighs heavily in favor of holding an evidentiary hearing. Nonetheless, the majority would dismiss such grave allegations as vague and speculative based on flawed comparisons with cases that differ significantly from this case in their procedural postures.

First, the content of White's declaration is no more vague or speculative than statements that have justified other evidentiary investigations. For instance, a judge stopped a trial and questioned the jury after a bare allegation that "ethnic slurs" had been made in the jury room. *See United States v. Heller*, 785 F.2d 1524, 1525 (11th Cir. 1986).

The majority compares White's statement[2] against several statements of racial bias discussed in other cases within this Circuit, and finds it lacking in some unquantified degree of specificity. *See* maj. op. at 8726-29. In most of the cases cited by the majority, however, an evidentiary hearing had already been held, which produced more specific and detailed statements of racial prejudice. *See Henley*, 238 F.3d at 1113 ("the district court conducted evidentiary hearings on the motions for a new trial"); *Heller*, 785 F.2d at 1525 (noting specific statements of racial bias were only revealed after the judge stopped deliberations and questioned the jury). And in *Fields v. Woodford*, the case on which the majority most heavily relies, it is not clear whether the appellant was seeking a new trial, or an evidentiary hearing, based on the scant evidence of racial bias. 315 F.3d 1062, 1063 (9th Cir. 2002) (as amended). This distinction in remedy sought is relevant since, as the cases cited by the majority demonstrate, far less specific evidence is needed to justify an evidentiary hearing than is required for the grant of a new trial. Here, the Appellants are not seeking a new trial, but merely an evidentiary hearing to explore in more detail the content of Juror No. 8's implied allegations of racial bias. The very purpose of that hearing would be to elicit the more specific statements of prejudice the majority is searching for.

Second, the strength of the allegations in White's declaration must be viewed in the context of the entire trial. According to the statement, Juror No. 8 implied that racial prejudice may have been behind her decision to seek dismissal from the jury. Such an inference is circumstantially corroborated by the actual dismissal of Juror No. 8, the only African-American juror. At the time of her dismissal, Juror No. 8 claimed she could not judge another person due to her religious beliefs.

---

[2]The majority also calls into question White's credibility. Maj. op. at 8728-29. The District Court, however, never explicitly found White not to be credible. Nor should we assume White's statements about her interaction with Juror No. 8 to be untrue.

During voir dire, however, she testified her beliefs would not interfere with her ability to deliberate. Furthermore, up until her request for dismissal, Juror No. 8 had been actively deliberating with the other jurors, as evidenced by two signed questions and requests for additional information that she submitted to the District Court.

Despite the fact that Juror No. 8 initially denied that the other jurors influenced her decision to request dismissal, that denial was called into question by her later statements to White and the circumstances of her dismissal. Only an evidentiary hearing can reconcile Juror No. 8's contradictory assertions. *See United States v. Jackson*, 209 F.3d 1103, 1109 (9th Cir. 2000) ("The discrepancy between the juror's statements during the voir dire and his later statement to the investigator calls for a resolution that can be reached only through an evidentiary hearing.").

Accordingly, I find the District Court abused its discretion by denying Appellants' request for an evidentiary hearing and would remand for a hearing on Appellants' allegations of racial prejudice within the jury.