**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Robin Sidney SAYA, Defendant–**
**Appellant.**

**No. 00–10004.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 12, 2001

Filed April 20, 2001

As amended May 8, 2001.

930

Judy Clarke, Federal Defenders of Eastern Washington and Idaho, Spokane, Washington, for the defendant-appellant.

Craig H. Nakamura, Office of the United States Attorney, Honolulu, Hawaii, for the plaintiff-appellee.

Before: NOONAN, McKEOWN and WARDLAW, Circuit Judges.

McKEOWN, Circuit Judge:

Robin Sidney Saya appeals his conviction and 240–month sentence following a jury trial on one count of conspiracy to possess with intent to distribute crystal methamphetamine, 21 U.S.C. § 846, and one count of attempted possession with intent to distribute crystal methamphetamine, 21 U.S.C. § 841(a)(1) and 846. Saya contends: (1) that his conviction requires reversal because the jury was exposed to extraneous information; (2) that he was improperly classified as a "career offender" under U.S.S.G. § 4B1.1; and (3)

that his sentence was improperly calculated in light of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). We affirm both the conviction and sentence.

## BACKGROUND AND PROCEDURAL HISTORY

Saya's conviction stems from a "reverse sting" operation undertaken by the Honolulu Police Department and the FBI in 1995. An FBI agent posed as a corrupt FBI agent willing to sell crystal methamphetamine (commonly known as "ice") stolen out of the FBI evidence locker. The agent met with Alfredo Bunag and offered to sell him fifty pounds of ice for $1 million. Bunag said he had only $500,000 but that he would obtain the rest from others, among them Saya, who would "invest" in the deal. Soon thereafter, Saya delivered $230,000 to Bunag; Robbie Sylva, another "investor," delivered $200,000. Bunag met with the agents and gave them $860,000 in exchange for two kilograms of ice. The agents promptly arrested Bunag, who immediately agreed to cooperate with the authorities. At the agents' direction, Bunag called Saya to lure him to the hotel room where the transaction was to have taken place; Saya was then arrested as well.

Saya was originally charged in November 1995 along with Bunag, Sylva, Brank Burke, Harland Kanahele, and Clinton Mau with possession with intent to distribute. Bunag, Kanahele, and Mau subsequently pled guilty. Sylva, Burke, and Saya stood trial in January 1997 in Hawaii; it ended in a mistrial. A fourth superceding indictment was then returned. Saya successfully moved for a change of venue due to pretrial publicity, and the case was transferred to the Eastern District of Washington. Saya's case, however, was severed from that of his two co-defendants.

He then requested that his case be sent back to Hawaii; his counsel stated that the publicity had since died down and that any lingering problems could be handled through jury voir dire.

Saya was tried before a jury in Honolulu in December 1998 and convicted on two counts: conspiracy to possess with intent to distribute and attempted possession with intent to distribute. After the trial, and with the court's permission, Saya's counsel contacted the jurors. Based on information contained in declarations provided by several of the jurors, Saya moved for a new trial.

The motion was based on allegations that jurors had discussed extraneous information pertaining to a 1993 incident at the Kukui Plaza parking garage in the Chinatown section of Honolulu. In that incident, Saya was driving his truck through the garage with his girlfriend Carol Ching in the passenger seat when Russell Cullen—apparently a lifelong friend of Saya—fired several shots into the truck, killing Ching and injuring Saya. Saya lost control of the truck, crashed through a wall, and knocked a parked car onto a bus on the street below. Saya's truck was left perched part way out of the garage, suspended over the street on the second floor of the garage. The dramatic scene attracted considerable media attention. Nothing in the record indicates that there was any connection between the Kukui Plaza shooting and the conduct relating to the drug deal that is the subject of Saya's current conviction.

Two jurors submitted declarations prepared by Saya's counsel stating that the Kukui Plaza shooting had been mentioned during deliberations. A third juror stated that he had actually walked by Kukui Plaza on the day of the incident and had seen the truck hanging out of the garage and that, at the beginning of the trial, he rec-

ognized Saya from media reports several years back. The same three jurors later submitted declarations prepared by a prosecuting attorney clarifying and elaborating upon their earlier statements.

The district court held a hearing on Saya's motion for a new trial at which both parties presented argument. The court specifically asked counsel whether they wished to present live testimony; both the defense attorney and prosecutor declined. The district court denied Saya's motion for a new trial in a written order.

At sentencing, the district court determined that Saya was a "career offender" pursuant to U.S.S.G. § 4B1.1. The two predicates for the career offender designation were a 1977 state murder conviction [1] and a witness intimidation conviction that same year, stemming from conduct related to the murder trial. The district court departed downward three levels based on diminished mental capacity and over-representation of Saya's criminal history, and also granted a two-level downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. The court imposed a sentence of 240 months.

## ANALYSIS

### I. Juror Misconduct

#### A. Was an evidentiary hearing with live witnesses required?

Saya claims that the district court erred by not hearing from live witnesses at an evidentiary hearing on the allegations of juror improprieties. We disagree. We review the denial of a post-verdict evidentiary hearing for an abuse of discretion. *United States v. Langford,* 802 F.2d 1176, 1180 (9th Cir.1986).

As an initial matter, we note that although evidentiary hearings often include live testimony, we need not determine whether a defendant has a specific right to present such testimony because, here, Saya clearly waived any right he may have had. Saya clearly and unambiguously waived his right to present witnesses at the hearing on the motion for a new trial. At the outset of the hearing, the district court specifically · asked Saya's counsel whether she wished to present live testimony. Her response in the negative could hardly have been clearer:

> **The Court:** All right. Please be seated. No party has requested an evidentiary hearing. So I assume no one wants to put on an evidentiary hearing....
>
> **Saya's Counsel:** Well, your honor, the filing of the declarations, we feel, is our evidence, and that's all we request.
>
> **The Court:** Okay. So that's all you want to put on, though?
>
> **Saya's Counsel:** That's correct.

It is difficult to imagine a clearer case of waiver.

Aside from the waiver issue, there is no rule in this circuit requiring the district court to hold an evidentiary hearing upon every allegation of juror misconduct. In *United States v. Bagnariol,* 665 F.2d 877, 885 (9th Cir.1981), we did hold that "The trial court, upon learning of a possible incident of juror misconduct, must hold an evidentiary hearing to determine the precise nature of the extraneous information." But cases following *Bagnariol* have modified that seemingly categorical statement. *United States v. Angulo,* 4 F.3d 843, 847 (9th Cir.1993) states current Ninth Circuit law on the subject: "An evidentiary hearing is not mandated every

---

**1.** Saya was actually convicted of one count of murder, six counts of attempted murder, and one count of illegal possession of a firearm.

time there is an allegation of jury misconduct or bias. Rather, in determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source." (citations omitted). We have further explained, "Although it is usually preferable to hold [an evidentiary] hearing," it is not necessary where "the court [knows] the exact scope and nature of the ... extraneous information." *United States v. Halbert,* 712 F.2d 388, 389 (9th Cir.1983); *accord United States v. Langford,* 802 F.2d 1176, 1180 (9th Cir.1986).

 What the district court did here to address the allegations of juror impropriety was weigh the submitted written declarations to determine whether Saya was entitled to a new trial. As noted above, we need not determine whether the court was required to go an extra step, *i.e.,* to hear live testimony, because, given the opportunity to present witnesses, Saya declined. In sum, the district court carefully considered the allegations of juror misconduct, read the juror declarations, gave both parties an opportunity to present live witnesses, conducted a hearing where both sides made legal arguments, and issued a thorough, well-reasoned order denying Saya's motion. Given the circumstances of this case, the district court did not abuse its discretion in the manner it addressed Saya's allegations of juror improprieties.

### B. Did the alleged juror misconduct require reversal?

Saya claims two separate instances of juror misconduct: (1) one of the jurors, whom we will refer to as "Juror T," [2] failed to answer honestly questions regarding his knowledge of the Kukui Plaza incident,

and Saya's connection to it, during voir dire, and (2) the jury was improperly exposed to extraneous information regarding Kukui Plaza during its deliberations. We address these claims in turn.

### 1. Voir Dire

 We review for abuse of discretion the district court's denial of a motion for a new trial based on allegations of juror misconduct stemming from alleged inconsistencies in voir dire responses. *See McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984); *see also Sea Hawk Seafoods, Inc. v. Alyeska Pipeline Serv. Co.,* 206 F.3d 900, 911 n. 19 (9th Cir.2000) (citing *United States v. Hanley,* 190 F.3d 1017, 1031 (9th Cir.1999)). Absent clear error, we do not disturb the district court's credibility findings and finding of fact related to the allegations. *Id.*

In voir dire proceedings, the court asked the jurors a number of questions; they were instructed to raise their hand if the answer was affirmative. Among these questions:

> Some people have the opinion that Chinatown has more than its fair share of criminal activity. Anyone agree with that statement?

> Has any of you, or anyone close to you, ever been affected by illegal gambling activities?

Juror T did not respond in the affirmative to these or other related questions. Also, in response to a written questionnaire given to potential jurors, he indicated that he had not heard of the case, had not heard of Robin Saya, and would be a fair and impartial juror.

---

**2.** We adopt this shorthand reference because the identity of the juror is not material to our

decision.

Saya claims that the answers Juror T gave during voir dire are contradicted by the declarations he signed after the trial. In his first post-trial declaration, filed in May, Juror T stated that he had walked by Kukui Plaza and had seen the truck hanging out of the garage on the day in question and, that night, had seen Saya's picture and learned that he "had been involved in the shooting." He went on to state,

At the beginning of the jury selection, before the questioning began, I looked at Mr. Saya, remembered his name and face and that he was the same person who had been shot in the incident at Kakui [sic] Plaza. As I looked at him, I remembered seeing his face on the television news after the shooting. As I heard his name, I remembered hearing his name on the television news after the shooting.

Later, in his July declaration, he modified his earlier statement:

I have thought about [my prior] statement a lot more and I can say now that, when the jury was being chosen, I did not recall anything about Robin Saya. It was when the evidence was coming in, that I recalled seeing Robin Saya's face on TV. When the evidence came in about Robin Saya's girlfriend either being dead or being killed (I cannot recall which), I then wondered if there was any connection between the girlfriend and the Kukui Plaza incident.... I did not know if Robin Saya was involved in the incident.

 The Supreme Court has set out a two-prong test for determining whether incorrect information supplied by a juror during voir dire requires a new trial:

[T]o obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question ... and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*McDonough Power Equip. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). Juror T's answers here do not meet the requirement for a new trial on either prong. First, the district court did not abuse its discretion in finding that Juror T did not fail to "answer honestly a material question." Specifically, the district court found that his July declaration, in which he stated that he had not realized there was any connection between Saya and Kukui Plaza until deliberations, was more credible than his May declaration, in which he stated that he had made the connection at voir dire. In addition, even assuming that Juror T intentionally lied in voir dire, any misstatements he may have made were not "material" under *McDonough.* As stated above, there was no connection between the Kukui Plaza incident and the crimes for which Saya stood trial.

Just as important, assuming that a juror had been exposed to information about the shooting, it is far from clear that such exposure "would have provided a valid basis for a challenge for cause." *McDonough,* 464 U.S. at 556, 104 S.Ct. 845. Saya, after all, was the *victim* of the shooting, not the perpetrator. And the fact that his girlfriend was killed while sitting next to him in the truck would most reasonably have caused jurors to sympathize with him, not to look upon him with disfavor or bias. For this reason, Juror T's possible knowledge about Saya would not necessarily have provided a basis for his dismissal for cause. Indeed, the Supreme Court has repeatedly stated that a juror need not necessarily be dismissed for cause even if

he has knowledge of the facts surrounding the actual crime or the defendant's prior convictions. *See, e.g., Mu'Min v. Virginia,* 500 U.S. 415, 417, 430–31, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991); *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); *Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). As the Court stated in *Patton,* "The relevant question is not whether the community remembered the case, but whether the jurors ... had such fixed opinions that they could not judge impartially the guilt of the defendant." 467 U.S. at 1035, 104 S.Ct. 2885. Here, Juror T stated that he could be fair and impartial, and, even if one believes (contrary to what the district court found) that he recognized Saya during voir dire, there is no indication that the information about the shooting would make him less so. In sum, the district court did not abuse its discretion in denying the motion for a new trial based on juror misconduct.

### 2. Jury's alleged exposure to extraneous information

■ Saya's second jury challenge, the claimed introduction of extrinsic evidence, is framed as a constitutional violation of his Sixth Amendment right to confrontation. We generally review denial of a motion for a new trial for abuse of discretion; "[a]lleged violations of the Confrontation Clause, however, are reviewed de novo." *United States v. Peterson,* 140 F.3d 819, 821 (9th Cir.1998). "A defendant is entitled to a new trial when the jury obtains or uses evidence that has not been introduced during trial if there is a reasonable possibility that the extrinsic material *could* have affected the verdict." *Dickson v. Sullivan,* 849 F.2d 403, 405 (9th Cir. 1988) (citation and quotation marks omitted) (emphasis in original). "The state bears the burden of proving that constitutional errors are harmless beyond a rea-

sonable doubt." *Id.* Because of the trial judge's "unique opportunity to observe the jurors during trial, to hear the defenses asserted, and to hear the evidence," the judge's "conclusion about the effect of the alleged misconduct deserves substantial weight." *Id.* (quoting *United States v. Bagnariol,* 665 F.2d 877, 885 (9th Cir.1981) (per curiam)). "Our review, however, is an independent one, and we must consider the entire record in determining whether the state has met its burden of demonstrating that extrinsic evidence did not contribute to the verdict." *Id.* at 405–06.

■ We do not have a "bright line test for determining whether a defendant has suffered prejudice from an instance of juror misconduct," *Sassounian v. Roe,* 230 F.3d 1097, 1109 (9th Cir.2000), but instead weigh a number of factors to determine whether the jury's exposure to extraneous information necessitates a new trial. These factors include:

(1) whether the material was actually received, and, if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jurors discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the material affected the verdict.

*Dickson,* 849 F.2d at 406. "Because the ultimate question is whether it can be concluded beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict, no one of these factors is dispositive." *Id.* (internal quotation marks and citations omitted) (citing *Bayramoglu v. Estelle,* 806 F.2d 880, 887 (9th Cir.1986)).

■ As to the first factor, it is clear from the declarations that the Kukui Plaza incident was mentioned in the jury room.

Less clear is exactly what was discussed. In his May declaration, one juror stated,

> During the deliberations of the jury, one of the jurors brought up that it was Mr. Saya's girlfriend, Carol Ching, that had been shot in Chinatown a few years earlier at Kukui Plaza. Before the juror brought it up, I did not know that Mr. Saya had been involved in that incident.

In his second (July) declaration, however, he elaborated on his previous statement, indicating that he never knew whether Saya was involved or even present at the incident. Another juror, in his July declaration,[3] stated,

> I believe it was prior to the jury reaching the verdict but it is possible that it might have been after we reached a verdict during the "downtime" when we were waiting for everyone to get together for the announcement of the verdict, somebody mentioned or raised a question as to where Carol fit into the picture. The person might have said Carol Ching, but I don't remember. I stated that I thought she was connected with a shooting incident at Kukui Plaza but I was not sure.

Juror T stated in his July declaration that he did not mention to any other jurors that he had witnessed the aftermath of the shooting. Thus it appears that two jurors mentioned the fact that Saya's girlfriend Carol Ching bore some connection to the Kukui Plaza incident, but beyond that fact the record is silent.

As to the second and fourth factors, which involve timing, the district court found that it could not determine when the extraneous material was introduced. As the court noted, one of the jurors stated that the discussion regarding Kukui Plaza may even have taken place after the verdict was reached.

■ As to the third factor, the extent to which the jury discussed and considered the Kukui Plaza incident was minimal. The only actual evidence of the time spent by the jury discussing the incident was one juror's estimate of 30 seconds.[4]

Lastly, as to the fifth, catch-all, *Dickson* factor, several other factors weigh against the necessity of a new trial. The mention of Kukui Plaza was brief, isolated, and followed immediately by a statement by the jury foreperson that such information was not to be considered in deciding on a verdict. The shooting had no connection whatsoever to the drug crime for which Saya was charged. The only reason that Carol Ching was even mentioned during the trial was to inform the jury how Saya had met his coconspirator Bunag (through Ching). And, to the extent that Saya may have been prejudiced by the link to Ching and her alleged criminal background, such link was invited by the defense. Saya's counsel told the jury during her opening statement, "[Saya] met Bunag though his girlfriend Carol. Carol's now dead. She died in '93, '94.... Carol ran a gambling, gaming house in Chinatown. She was very close to Bunag." Defense counsel also elicited similar testimony during the cross-examination of Bunag. Thus any prejudice caused by introduction of extraneous information was cumulative of whatever prejudice may have been precipitated by the defense's references to Ching during trial.

---

**3.** A May declaration bearing the juror's name, but unsigned, was prepared by the defense.

**4.** Evidence relating to the actual effect of the information on jurors is inadmissible pursuant to Fed.R.Evid. 606(b). *See Hard v. Burlington N. R.R.,* 812 F.2d 482, 485–86 (9th Cir.1987); *United States v. Rohrer,* 708 F.2d 429, 434 (9th Cir.1983).

Also of consequence in determining whether the introduction of extraneous information constituted prejudice is the amount and strength of the government's evidence against the defendant. Here, the case against Saya was strong: "overwhelming," the district court stated in its order denying Saya's motion for a new trial. The prosecution introduced tapes of Saya and Bunag discussing the ice deal, and Bunag testified that Saya delivered $230,000 to his apartment for partial payment; many additional details were also corroborated by the testimony of FBI agents and Honolulu Police Department officers.[5]

In sum, the district court did not abuse its discretion in denying Saya's motion for a new trial.

## II. Sentencing Issues

Interpretation and application of the sentencing guidelines is reviewed de novo. *United States v. Castillo,* 181 F.3d 1129, 1134 (9th Cir.1999). The constitutionality of a sentence is also reviewed de novo. *United States v. Mezas de Jesus,* 217 F.3d 638, 642 (9th Cir.2000).

### A. Career Offender Status

Saya asserts that he was improperly classified a "career offender," subjecting him to an enhanced sentence under U.S.S.G. § 4B1.1. The career offender guideline sets forth a three-prong test for determining applicability. The first two prongs, related to actual crime for which

the defendant has just been found guilty, are not at issue here. Rather, the parties dispute whether Saya satisfied the third prong: whether "the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." *Id.* at § 4B1.1(3).

Saya concedes that he has one such felony conviction: a Hawaii state conviction on one count of murder, six counts of attempted murder, and one count of illegal possession of a firearm. On May 13, 1977, he was sentenced to twenty years for the murder and attempted murder counts, and to a concurrent five years on the weapons charge. Saya was released on parole January 8, 1988.

■■■ The dispute is over whether Saya's conviction for witness intimidation was properly counted toward the career offender classification. Just after his murder conviction, Saya approached a witness and threatened her. He was arrested March 30, 1977, for intimidating a witness, convicted shortly thereafter, and, on April 19, 1977, sentenced to five years, to be served concurrent with the twenty-year murder sentence. Saya asserts that this conviction should not count towards career offender status because it cannot be determined with certainty that his sentence meets the requirement of U.S.S.G. § 4A1.2(e)(1): "[C]ount any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen year period

---

5. This circuit has identified a number of additional factors that may tend to minimize prejudice:

whether the prejudicial statement was ambiguously phrased; whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial; whether a curative instruction was given or some other step taken to ameliorate the prejudice; the trial context;

and whether the statement was insufficiently prejudicial given the issues and evidence in the case.

*Jeffries v. Wood,* 114 F.3d 1484, 1491–92 (9th Cir.1997) (en banc). Given the discussion above, application of these additional, overlapping factors would not add significantly to the analysis, nor would it alter our conclusion.

[preceding the commencement of the instant offense]."

Fifteen years from the date of the instant offense, November 3, 1995, extends back to November 3, 1980. Saya was indisputably in prison on this date. He contends, however, that the government has not demonstrated that the five-year sentence for witness intimidation "resulted in the defendant being incarcerated," *id.*, on this date. According to Saya, he was never given a hearing pursuant to Hawaii Revised Statutes § 706–669, which mandates that the Hawaii paroling authority determine, within six months of the convict's incarceration, the minimum term he must serve before becoming eligible for parole. If he had been given this hearing,[6] Saya asserts, he might have been paroled on the witness intimidation charge before November 3, 1980 (thus putting him outside the fifteen-year range), even though he was still serving a much longer sentence for murder. This semantic mindbender yields no relief for Saya.

Saya's theory fails to account for the reality of the circumstances of his incarceration on the murder and witness intimidation convictions. We fail to see how, even if Saya had a parole eligibility hearing to set his minimum sentence on the witness intimidation conviction, he could have been paroled on that sentence before November 3, 1980 (less than three years into a five-year sentence) when he was also serving a concurrent twenty-year murder sentence. In his brief on appeal, Saya appears to acknowledge the point that a hearing on the witness intimidation sentence would have served no purpose: "The twenty-year sentence overrode the importance of parole review at the time the five-year sentence was imposed, as the five

years were simply incorporated into the twenty-year [murder] term."

■ What Saya is, in effect, attempting to do is mount a collateral attack on his prior state sentence; his theory is that he was held in violation of Hawaii law because he was not given a hearing pursuant to § 706–669, and thus that his incarceration for the witness intimidation conviction should not be held against him for federal sentencing purposes. As a general rule, however, collateral attacks on prior state convictions are not permitted in federal sentencing proceedings unless the defendant asserts a total denial of his right to counsel in the previous proceeding. *See Custis v. United States,* 511 U.S. 485, 494–95, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994). We see no reason why the *Custis* rule should not apply to collateral attacks on prior state *sentences* as well. The Supreme Court warned that challenges to long-ago convictions "would require sentencing courts to rummage through frequently nonexistent or difficult to obtain state-court transcripts or records that may date from another era." *Id.* at 496, 114 S.Ct. 1732. This concern seems particularly relevant here, where the record on appeal does not contain any documents pertaining to Saya's parole proceedings in Hawaii state prison in the late 1970s.

We conclude that the district court did not err in classifying Saya as a career offender pursuant to U.S.S.G. § 4B1.1.

### B. *Apprendi* Claim

Saya's claim under *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), presents a novel issue relating to the interplay between *Apprendi* and the appropriate calculations under the

---

**6.** Nothing in the record on appeal (apart from Saya's counsel's representation at the sentencing hearing and in the appellate brief) establishes one way or the other whether such a hearing actually occurred.

"career offender" guideline, U.S.S.G. § 4B1.1. We conclude that the calculation here did violate *Apprendi*, but that Saya is not entitled to relief because the error was harmless.

The district court calculated Saya's sentence as follows: The court attributed to him fifty pounds of ice, a fact to which he admitted at sentencing. This resulted in an offense level of 36 pursuant to U.S.S.G. § 2D1.1 (drug quantity table). ·The court next determined that Saya was subject to the "career offender" provisions of U.S.S.G. § 4B1.1, which sets a new offense level for defendants who meet the guideline's three separate criteria. The new offense level (which applies only if it is greater than the offense level "otherwise applicable," *i.e.,* the original 36) is based upon the "offense statutory maximum," defined as "the maximum term of imprisonment authorized for the offense of conviction." *Id.* at Application Note 2. The court determined the "offense statutory maximum" to be life imprisonment, which is authorized for a conviction under 21 U.S.C. § 841(b)(1)(A)(viii), the penalty provision applicable to a conviction under § 841 involving fifty pounds of ice.[7] Under the table contained in U.S.S.G. § 4B1.1, the offense level applicable to a conviction for a crime with an offense statutory maximum of life imprisonment is 37. Thus, application of the "career offender" provisions raised Saya's offense level from 36 to 37.

Taking the 37 as the starting point, the court then granted Saya a three-level downward departure and a two-level downward adjustment for acceptance of responsibility under § 3E1.1(a), resulting in an

offense level of 32. Given Saya's criminal history category of VI (mandated for all defendants sentenced under § 4B1.1), the guidelines range was 210–262 months; the court sentenced him to 240 months.

■ The district court appears to have applied the guidelines correctly, given the controlling case law at the time of sentencing. Subsequent to his sentencing, however, the Supreme Court decided *Apprendi. Apprendi* has spawned a new, complicated, and yet-to-be-fully-developed regime for evaluation of sentencing issues. In *Apprendi,* the Court held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 120 S.Ct. at 2362–63. Saya argues that *Apprendi* affects the application of the career offender guideline in these circumstances. We agree.

Although at first blush this may appear to be an intricate argument, the logic—nicely articulated by Saya's counsel—is quite straightforward. Specifically, *Apprendi* and its Ninth Circuit progeny require the jury to find, beyond a reasonable doubt, facts which may alter· the calculation of the "offense statutory maximum." Generally, the "offense statutory maximum" does not play a role in applying the guidelines themselves. But U.S.S.G § 4B1.1 makes the "offense statutory maximum" the determinative factor in calculating a sentence under the career offender guideline.

The statutory maximum penalty under 21 U.S.C. § 841 turns on the amount of drugs involved. Whereas prior to *Apprendi* the drug quantity could be determined

---

7. This provision sets a minimum penalty of ten years and a maximum of life imprisonment for a conviction concerning "50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 500 grams or

more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers." 21 U.S.C. § 841(b)(1)(A)(viii).

by the court by a preponderance of the evidence, it now must be proven beyond a reasonable doubt and determined by the jury. *See United States v. Nordby*, 225 F.3d 1053, 1059–60 (9th Cir.2000). Thus, the district court's attribution of the fifty pounds of ice to Saya and consequent determination that he faced a maximum sentence of life under 21 U.S.C. § 841(b)(1)(A)(viii) was not proper under *Nordby*.

The district court's error thus tainted its sentencing calculation under the career offender guideline. The court was only empowered to sentence Saya to twenty years, the maximum authorized by the jury's verdict—a conviction for conspiracy to possess a detectable quantity of methamphetamine with the intent to distribute under 21 U.S.C. § 841(b)(1)(C). Had the court applied the career offender guideline to an offense statutory maximum of twenty years instead of life, the offense level would have been 32 instead of 37. U.S.S.G. § 4B1.1.[8] Thus, we conclude that the district court's calculation of Saya's offense level under the career offender guideline violated *Apprendi*.

■ The question remains what remedy, if any, is available to Saya for the improper application of the guidelines. Saya and the government agree that the issue is subject to plain error review and that the question thus boils down to whether the error affected Saya's substantial rights and "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997); *Nordby*, 225 F.3d at 1059–60.

Saya was not given a sentence beyond the statutory maximum authorized by the jury's verdict for conspiracy to possess with intent to distribute a detectable amount of methamphetamine: twenty years. *See* 21 U.S.C. § 841(b)(1)(C). We have held repeatedly that a defendant cannot obtain relief under *Apprendi* when his sentence does not exceed the statutory maximum authorized by the jury's verdict, even if the district court determined the drug amount by a preponderance of the evidence, instead of having the jury determine the amount beyond a reasonable doubt. *See United States v. Garcia–Guizar*, 234 F.3d 483, 488–89 (9th Cir.2000); *United States v. Scheele*, 231 F.3d 492, 497 n. 2 (9th Cir.2000); *United States v. Hernandez–Guardado*, 228 F.3d 1017, 1027 (9th Cir.2000); *United States v. Egge*, 223 F.3d 1128, 1132 n. 1 (9th Cir.2000).

We conclude that any *Apprendi* error that may have affected the calculation of Saya's sentence did not "seriously affect[ ] the fairness, integrity, or public reputation of judicial proceedings." *Johnson*, 520 U.S. at 467, 117 S.Ct. 1544. We therefore affirm his sentence of 240 months.

**AFFIRMED.**

---

8. We cannot say whether, had the jury determined the drug amount as required by *Nordby*, Saya would, in fact, have been sentenced as a career offender, because we cannot know whether the offense level as determined by the table in U.S.S.G. § 4B1.1 would have been greater than the offense statutory maximum "otherwise applicable."