NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

EDWARDO SERRATO, III, *Appellant*.

No. 1 CA-CR 23-0384

FILED 09-17-2024

Appeal from the Superior Court in Mohave County
No. S8015CR201800630
The Honorable Billy K. Sipe, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michael T. O'Toole
*Counsel for Appellee*

Harris & Winger, P.C., Flagstaff
By Chad Joshua Winger
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Cynthia J. Bailey delivered the decision of the Court, in which Judge Anni Hill Foster and Judge Angela K. Paton joined.

---

**B A I L E Y**, Judge:

¶1        Edwardo Serrato, III appeals his convictions and sentences for second-degree murder, burglary in the first degree, arson of an occupied structure, theft of means of transportation, and attempted arson of an occupied structure.[1]   For the following reasons, we affirm Serrato's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

¶2        We view the facts in the light most favorable to sustaining Serrato's convictions. *See State v. Thompson*, 252 Ariz. 279, 287 n.3 (2022).

¶3        One night in December 2007, Kingman firefighters found a pickup truck on fire.  The truck smelled like gasoline, and there was a melted gas can on the passenger seat.  An arson investigator determined that the fire was set in the truck's passenger compartment.

¶4        The truck belonged to Alice,[2] who lived about a mile away from where the truck was found.  Police officers went to Alice's house and found her lying on the floor with a large pool of blood around her head.  Alice was alive but nonresponsive.  Her gas kitchen stove was on, her house smelled like gas, and her kitchen table had burn marks on it.  Alice's jewelry, coins, cash, and gun were missing.  Alice died the next day.  A medical examiner determined her cause of death was "[b]lunt force head injuries due to assault" with a rigid instrument.

¶5        Serrato lived across the street from Alice with his sister, Molly, and niece, Amy.  About two weeks before Alice died, Serrato

---

[1] We address whether Serrato's presence was sufficient to find the truck was an occupied structure in a separate contemporaneously filed opinion.

[2] We use pseudonyms to protect the victim's and witnesses' privacy. *See State v. Maldonado*, 206 Ariz. 339, 341, ¶ 2 n.1 (App. 2003).

mentioned to Molly that Alice lived by herself. The night Alice was attacked, Amy saw Serrato enter their house through the backdoor. Serrato smelled like gasoline, he had a gun that looked like Alice's missing gun, and he was holding a pillowcase that sounded like it had coins and jewelry in it. Serrato told Amy he "did something really bad." He then hugged Amy and cried.

¶6    Later that night, Molly awoke and saw ambulance lights flashing across the street. Serrato pulled out the gun and said, "[W]hat's the difference if I just shot you guys right now[?]" Amy got between Serrato and Molly and said, "[D]on't you dare try to shoot my mom." Molly asked Serrato what he did, and Serrato replied, "[D]on't tell nobody." The next day, Molly asked Serrato what happened, and he said he "d[idn't] want to talk about it." Referencing the night before, Molly said, "[W]e were here," and Serrato responded, "[W]e were *all* here." (Emphasis added.) Two days after Alice was attacked, Molly and Amy reported Serrato to the police. The police recorded interviews with both women and arrested Serrato.

¶7    The night Alice was attacked, a police officer saw a fire burning behind Serrato's house. Later, an investigator found a burn barrel in Serrato's backyard that contained a burned jewelry box and burned jewelry.

¶8    A grand jury indicted Serrato for first-degree murder (count 1), burglary in the first degree (count 2), arson of an occupied structure (the pickup truck) (count 3), theft of means of transportation (count 4), attempted arson of an occupied structure (the house) (count 5), and theft (count 6). Before trial, the superior court entered a directed verdict dismissing count 6.

¶9    In July 2023, the jury acquitted Serrato of first-degree murder but found him guilty of the lesser-included offense of second-degree murder. The jury also found Serrato guilty of counts 2 through 5. The jury found count 5 was a dangerous offense and found the State proved multiple aggravating circumstances for each count.

¶10    The State withdrew the dangerousness allegation for count 5. The superior court sentenced Serrato to the maximum flat-time 25-year prison term for count 1. The court also imposed aggravated, consecutive prison sentences of 35 years each for counts 2 and 3, 25 years for count 4, and 15 years for count 5. Serrato received 1,436 days' credit for presentence incarceration.

¶11        We have jurisdiction over Serrato's timely appeal under Article 6, Section 9, of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1), 13-4031, and 13-4033(A)(1).

## DISCUSSION

I.        Sufficient Evidence

¶12        Serrato argues insufficient evidence supports his convictions.

¶13        We review de novo whether a conviction is based on sufficient evidence.  *State v. West*, 226 Ariz. 559, 562, ¶ 15 (2011).  "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* at ¶ 16 (citations omitted).  We reverse "only where there is a complete absence of probative facts to support the conviction."  *State v. Allen*, 253 Ariz. 306, 341, ¶ 109 (2022) (citations omitted).  The jury weighs the evidence and determines the witnesses' credibility.  *Id.* (citation omitted).  Evidence may be direct or circumstantial.  *State v. Blevins*, 128 Ariz. 64, 67 (App. 1981).  "The probative value of evidence is not reduced simply because it is circumstantial."  *Id.* (citation omitted).  "A conviction may be sustained on circumstantial evidence alone."  *Id.* (citation omitted).

¶14        As applicable below, "[i]ntentionally" is defined as, "with respect to a result or to conduct described by a statute defining an offense, that a person's objective is to cause that result or to engage in that conduct."  A.R.S. § 13-105(10)(a).[3]  "Knowingly" is defined as, "with respect to conduct or to a circumstance described by a statute defining an offense, that a person is aware or believes that his or her conduct is of that nature or that the circumstance exists."  A.R.S. § 13-105(9)(b) (Supp. 2007).

A.  Second-Degree Murder

¶15        Serrato argues that insufficient evidence supports his second-degree murder conviction because "no evidence was presented it was [Serrato] who entered [Alice's] residence and killed [her]."  As applicable here, a person commits second-degree murder if, without premeditation, the person: (1) "intentionally causes the death of another person"; or (2) "[k]nowing that [his] conduct will cause death or serious physical injury

---

[3] When the material provisions have not changed since the offenses were committed, we cite the current versions of the statutes.

. . . causes the death of another person"; or (3) "[u]nder circumstances manifesting extreme indifference to human life . . . recklessly engages in conduct that creates a grave risk of death and thereby causes the death of another person[.]"  A.R.S. § 13-1104(A).

¶16 Police found Alice lying on the floor with a large pool of blood around her head.  A medical examiner testified Alice had "abrasions and contusions and lacerations to [her] face, forehead, and scalp," "hemorrhag[ing] inside [her] skull," "contusions of the brain," and "extensive [skull] fracturing."  Alice also had "defensive-type injuries" on her hands and arms.  Given Alice's extensive injuries, a rational trier of fact could have found it was the assailant's objective to cause her death, or that the assailant knew his conduct would cause her serious physical injury or death.  Further, the medical examiner testified that Alice's cause of death was "[b]lunt force head injuries due to assault" with a rigid instrument, so a rational trier of fact could have found that Alice's assailant caused her death.

¶17 Serrato lived across the street from Alice, he knew Alice lived alone, and he mentioned it to Molly shortly before Alice died.  Alice's jewelry, coins, and gun were missing.  The night of the attack, Amy saw Serrato enter their house holding a gun that looked like Alice's gun and a pillowcase that sounded like it had coins and jewelry in it.  Serrato cried and told Amy he "did something really bad."  Serrato also told Molly and Amy "don't tell nobody" and emphasized that they were "all" at home the night of the attack.  Further, the night Alice was attacked, a police officer saw a fire burning in Serrato's backyard.  And the burn barrel in Serrato's backyard contained a burned jewelry box and burned jewelry.  Based on this evidence, a rational trier of fact could have found Serrato was Alice's assailant and found him guilty of second-degree murder.

B.  Burglary in the First Degree

¶18 Serrato argues insufficient evidence supports his burglary in the first degree conviction because "there is no evidence [he] was present in the home to satisfy he was even there let alone remained there unlawfully."[4]  A person commits burglary in the first degree "by entering or remaining unlawfully in or on a residential structure with the intent to commit any theft or any felony therein" and "knowingly possesses

---

[4] Serrato also emphasizes that "no evidence was presented of forced entry." But forced entry is not an element of burglary in the first degree. *See* A.R.S. §§ 13-1508(A), -1507(A).

explosives, a deadly weapon or a dangerous instrument in the course of committing any theft or any felony." A.R.S. §§ 13-1507(A), -1508(A). "In the course of committing" is defined as "any acts that are performed by an intruder from the moment of entry to and including flight from the scene of a crime." A.R.S. § 13-1501(7). A "[d]angerous instrument" is defined as "anything that under the circumstances in which it is used . . . is readily capable of causing death or serious physical injury." A.R.S. § 13-105(12). A theft occurs if a person, without lawful authority, knowingly "[c]ontrols property of another with the intent to deprive the other person of such property[.]" A.R.S. § 13-1802(A)(1).

**¶19** Alice was hit with a rigid instrument, left bleeding and nonresponsive, and her jewelry, gun, money, and truck were missing. Based on this evidence, the jury could have inferred that someone entered or remained unlawfully in Alice's house with the intent to commit a theft. Further, Alice's cause of death was "[b]lunt force head injuries due to assault," and the medical examiner testified Alice's injuries could have been caused by a rigid object. Accordingly, a rational trier of fact could have found that someone knowingly possessed an instrument which, under the circumstances in which it was used, was readily capable of causing death. And, given that Alice's belongings went missing the same night she was attacked, the jury could have rationally found the perpetrator knowingly possessed the deadly weapon or dangerous instrument in the course of committing the theft.

**¶20** Based on this evidence, Serrato's statements and conduct the night Alice was attacked, and the items in Serrato's burn barrel, *see supra* ¶ 17, the jury could have convicted Serrato of burglary in the first degree.

### C. Attempted Arson of an Occupied Structure

**¶21** "A person commits arson of an occupied structure by knowingly and unlawfully damaging an occupied structure by knowingly causing a fire or explosion." A.R.S. § 13-1704(A).[5] As applicable here, "[a] person commits attempt if, acting with the kind of culpability otherwise

---

[5] The jury instructions stated that arson of an occupied structure "requires proof that the defendant: 1. *Intentionally* and unlawfully damaged an occupied structure, and 2. Did so by knowingly causing a fire or an explosion." (Emphasis added.) The instruction misstated A.R.S. § 13-1704, but this did not prejudice Serrato. *See* A.R.S. § 13-202(C) ("If acting knowingly suffices to establish an element, that element is also established if a person acts intentionally.").

required for commission of an offense, such person . . . [i]ntentionally does or omits to do anything which, under the circumstances as such person believes them to be, is any step in a course of conduct planned to culminate in commission of an offense[.]" A.R.S. § 13-1001(A)(2). An "[o]ccupied structure" includes "any dwelling house." *See* A.R.S. § 13-1701(2).

**¶22** Alice's gas kitchen stove was left on, and her house had "[a] strong odor of natural gas." Her kitchen tabletop had burned paper and burn marks on it, which a police officer testified was consistent with "a fire [being] set on the table." Based on this, a rational trier of fact could have found that someone intentionally took a "step in a course of conduct planned to culminate" in committing arson of Alice's house, which qualified as an occupied structure. *See* A.R.S. § 13-1701(2).

**¶23** That same night, Serrato smelled like gasoline. The evidence supports the jury's finding that Serrato entered Alice's house, hit her, and took her belongings. And it was rational for the jury to find that the same person who attacked Alice and took her belongings also tried to set Alice's house on fire to cover up the other crimes. Accordingly, sufficient evidence supports Serrato's attempted arson of an occupied structure conviction.

D. Theft of Means of Transportation

**¶24** "A person commits theft of means of transportation if, without lawful authority, the person knowingly . . . [c]ontrols another person's means of transportation with the intent to permanently deprive the person of the means of transportation." A.R.S. § 13-1814(A)(1). "Means of transportation" is defined as "any vehicle." A.R.S. § 13-1801(A)(9).

**¶25** Firefighters found Alice's truck on fire about a mile away from her house. Earlier that day, the truck was parked outside Alice's house. Based on this, a rational trier of fact could have found that someone knowingly controlled Alice's truck with the intent to permanently deprive her of the truck. Further, given Alice was attacked and left bleeding and nonresponsive, the jury could have inferred that the person who took Alice's truck did not have authority to do so.

**¶26** That night, Alice's truck and Serrato smelled like gasoline. The evidence supports finding Serrato attacked Alice, took her belongings, and set her truck on fire. And, given the truck was taken the same night and from the same place, it was rational for the jury to find that the same person who attacked Alice also took her truck. Thus, sufficient evidence supports Serrato's conviction for theft of means of transportation.

E.  Arson of an Occupied Structure

¶27          "A person commits arson of an occupied structure by knowingly and unlawfully damaging an occupied structure by knowingly causing a fire or explosion."  A.R.S. § 13-1704(A).  "Knowingly" is defined as, "with respect to conduct or to a circumstance described by a statute defining an offense, that a person is aware or believes that his or her conduct is of that nature or that the circumstance exists."  A.R.S. § 13-105(9)(b) (Supp. 2007).  An "[o]ccupied structure" is defined as "any structure [including a vehicle] in which one or more human beings either is or is likely to be present or so near as to be in equivalent danger at the time the fire or explosion occurs."  A.R.S. § 13-1701(2), (4).

¶28          During his closing argument, the prosecutor argued:

     [Serrato] himself was obviously present when he set the truck on fire, so his presence alone makes the truck an occupied structure, even if no one was inside the vehicle.  And when he set fire to the truck on a street within the Kingman city limits, he obviously endangered other people who lived or could have easily passed through the area.

¶29          We ordered supplemental briefing to address whether Serrato's presence or the truck's location within Kingman city limits were sufficient to find the truck was an occupied structure.  In our separately published opinion, we held that a defendant's presence alone is sufficient to sustain a conviction for arson of an occupied structure.  Applying that holding here, sufficient evidence supports Serrato's arson of an occupied structure conviction.

¶30          Firefighters found Alice's truck on fire about a mile away from her house.  The truck smelled like gasoline, and it had a melted gas can on the passenger seat.  An arson investigator determined the fire was set in the truck's passenger compartment.  Based on this evidence, the jury could have found that someone knowingly set Alice's truck on fire.  Further, because the fire was set in the truck's passenger compartment, the jury could have inferred that the person was either inside the truck when he set it on fire, "or so near as to be in equivalent danger at the time the fire or explosion occur[red]."  *See* A.R.S. § 13-1701(2), (4).

¶31          Serrato smelled like gasoline, he told Amy he "did something really bad" and he emphasized they were "all" at home the night of the incident.  Further, sufficient evidence supports the jury's finding that Serrato attacked Alice and took her truck, and it was rational for the jury to

find that the same person also set her truck on fire. Accordingly, sufficient evidence supports Serrato's arson of an occupied structure conviction.

¶32       The parties agree that the truck's location within Kingman city limits was insufficient for the jury to find the truck was occupied. We agree and address whether the prosecutor's erroneous statement constitutes fundamental, prejudicial error.

¶33       Serrato did not object, so he must show fundamental error. *See State v. Escalante*, 245 Ariz. 135, 140, ¶ 12 (2018). To prevail under fundamental error review, a defendant must show: (1) the superior court erred, and (2) the error was fundamental—meaning the error went to the foundation of the case, took from the defendant a right essential to his defense, or was so egregious that he could not possibly have received a fair trial. *Id.* at 142, ¶ 21. Under the first or second prong, the defendant must also show prejudice, but if he shows the error was so egregious that he could not possibly have received a fair trial, prejudice is presumed. *Id.*

¶34       The first prong is satisfied because—without evidence showing a human being was present, likely to be present, or "so near as to be in equivalent danger"—the truck's location within Kingman city limits was insufficient as a matter of law. *See* A.R.S. § 13-1701(2). But as to the second prong, the prosecutor's statement did not constitute fundamental, prejudicial error. The jury instructions tracked the occupied structure definition, stating that, to find the truck was occupied, the jury had to find "one or more human beings were present, were likely to be present, or were so near as to be in equivalent danger at the time the fire or explosion occurred." *See id.* We presume the jury followed those instructions. *Allen*, 253 Ariz. at 334, ¶ 62 (citation omitted). Further, to establish prejudice, the defendant must show "a reasonable jury *could have* reached a different verdict." *Escalante*, 245 Ariz. at 144, ¶ 29 (citing *State v. Henderson*, 210 Ariz. 561, 569, ¶ 29 (2010)). The evidence here showed that the arsonist started the fire by igniting a gas can on the truck's passenger seat. Thus, the evidence supported the jury's finding that Serrato was either inside, or immediately adjacent to, the truck when he lit it on fire. Accordingly, Serrato was not prejudiced by the prosecutor's statement.

II.       Striking a Prospective Juror

¶35       Serrato argues the superior court erroneously struck Prospective Juror 16.

¶36       We review the decision to strike a prospective juror for an abuse of discretion. *Allen*, 253 Ariz. at 330, ¶ 41 (citation omitted). "A court

abuses its discretion when its reasons for a ruling are 'clearly untenable, legally incorrect, or amount to a denial of justice.'" *Id.* (citations omitted). We defer to the superior court's perception of the juror and consider only whether its findings are supported by the record. *Id.* at 331, ¶ 47. The superior court must excuse a juror when "there is a reasonable ground to believe that the juror . . . cannot render a fair and impartial verdict." Ariz. R. Crim. P. 18.4(b). A prospective juror should be excused if his "answers demonstrate that he has serious misgivings about his ability to be a fair and impartial juror." *State v. Smith*, 182 Ariz. 113, 115 (App. 1995) (citation omitted).

¶37        During jury selection, the superior court told the prospective jurors that one of the witnesses had a drug addiction and asked if they could be fair and impartial. Prospective Juror 16 responded, "I have a . . . close friend that I grew up with that struggles with drug abuse, and what I've learned is that I can't trust him. So I don't know if that would help me be impartial or not in something like this." Prospective Juror 16 also said, "I feel like anyone that . . . has or uses drugs . . . is not someone that you can trust." The superior court asked Prospective Juror 16, "So all things being equal, you probably would not trust a witness if you heard that this witness had been drug-addicted or used drugs?" Prospective Juror 16 responded, "I think that might be the case." The superior court then excused Prospective Juror 16. Serrato objected.

¶38        Serrato contends that "[s]imply having experience with untrustworthy drug addicts is not a constitutionally adequate basis to strike a juror when the juror otherwise unequivocally affirms that he or she can follow the law and determine guilt based on all of the evidence." But Prospective Juror 16 said, "[*A*]*nyone* [who uses] drugs is not someone that you can trust." (Emphasis added.) Further, Prospective Juror 16 agreed that all else being equal, he would not trust a witness who used drugs. The superior court had reasonable grounds to believe Prospective Juror 16 could not be fair and impartial.

¶39        Moreover, even assuming arguendo that Prospective Juror 16 should not have been excused, we do not reverse "unless the record affirmatively shows that [the] defendant was not tried by a fair and impartial jury[.]" *State v. Thomas*, 133 Ariz. 533, 537 (1982) (citation omitted). Serrato does not argue he was not tried by a fair and impartial jury, and we find nothing in the record supporting such a claim. Accordingly, we find no error.

   III.    Confrontation Clause

10

¶40          Serrato argues the superior court erred by admitting Amy's recorded interview because it prevented him from effectively cross-examining her.

¶41          "We review interpretations of the Confrontation Clause de novo[.]" *State v. Medina*, 232 Ariz. 391, 405, ¶ 53 (2013) (citation omitted). Out-of-court testimonial statements may not be admitted unless the defense has an opportunity to cross-examine the declarant. *Id.* at ¶ 54 (citations omitted). "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of [her] prior testimonial statements." *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) (citation omitted).[6]  Further, when a declarant can "no longer remember certain details of the crime," no Confrontation Clause violation occurs if the declarant testifies at trial and is "subjected to unrestricted cross-examination." *State v. King*, 180 Ariz. 268, 276 (1994).

¶42          The police recorded an interview with Amy in 2007.  At the start of the trial, the State argued Amy was feigning memory loss and asked the superior court to admit her recorded interview as an inconsistent statement.[7]  Serrato argued Amy was not feigning memory loss.  The superior court ruled that the interview could be read into the record as a recorded recollection, but it could not determine whether Amy was feigning memory loss, so it was not admissible as an inconsistent statement. The court said its ruling was subject to change because Amy had not testified yet, and "maybe there's something she'll say . . . or something about her manner while she's testifying . . . which may convince me she's . . . faking her memory loss."  After Amy testified, the court determined that she was feigning memory loss and allowed the State to admit her interview as an inconsistent statement.

¶43          Amy testified at trial, and she was cross-examined by Serrato's counsel.  Serrato contends that, had he known the interview would be admitted as an inconsistent statement, he would have cross-

---

[6] This statement is dicta, but it is consistent with the United States Supreme Court's prior decisions. *See State v. Real*, 214 Ariz. 232, 234, ¶¶ 5–6 (App. 2007).

[7] Recorded recollections may be read into the record but may not be received as an exhibit unless offered by an adverse party. *See* Ariz. R. Evid. 803(5).  But if a witness feigns memory loss, then the prior statement is admissible as an inconsistent statement. *See* Ariz. R. Evid. 801(d)(1)(A); *State v. Joe*, 234 Ariz. 26, 29, ¶ 14 (App. 2014).

examined Amy differently. But Serrato knew, before Amy testified, that her recorded statement would be read into the record as a recorded recollection, and he cross-examined her about the interview. *See King*, 180 Ariz. at 276 ("Defendant's opportunity to cross-examine [the declarant] before a jury satisfies the requirements of the [C]onfrontation [C]lause."). Admitting the recording did not violate Serrato's Confrontation Clause rights.

IV.     Extrinsic Evidence

¶44     Serrato argues the superior court abused its discretion by denying his motion for a new trial without holding an evidentiary hearing.

¶45     During deliberations, the superior court became concerned that the jury received unadmitted evidence. The court went through the exhibits and found unadmitted empty evidence vials and Serrato's financial documents. Serrato's counsel requested a jury instruction and said he was "concern[ed]" that a juror with law enforcement experience would know what the vials "could be without any testimony," which could "substantially impair [Serrato's] right to a fair and impartial verdict." The court removed the vials and documents from the evidence box and instructed the jury that "there might be some items that were in the evidence box that are no longer in the evidence box." Serrato did not object to this instruction. Later, Serrato moved for a new trial, based, in part, on jury misconduct. After a hearing, the superior court found that "there's no evidence [the jury] reviewed . . . or relied upon the [items]." The superior court also found the items were "innocuous and could not have possibly contributed to the guilty verdicts in this case."

a. Motion for New Trial

¶46     We review the superior court's denial of a motion for a new trial based on alleged jury misconduct for an abuse of discretion. *State v. Hall*, 204 Ariz. 442, 447, ¶ 16 (2003). A defendant is entitled "to a new trial if the jury receives extrinsic evidence and 'it cannot be concluded beyond a reasonable doubt that the extrinsic evidence did not contribute to the verdict.'" *Id.* (citations omitted); *see also* Ariz. R. Crim. P. 24.1(c)(3)(A) ("The court may grant a new trial or phase of trial if . . . one or more jurors committed misconduct by . . . receiving evidence not admitted during the

trial . . . .").[8]  "[J]uror misconduct warrants a new trial if the defense shows actual prejudice *or if prejudice may be fairly presumed from the facts*."  *Hall*, 204 Ariz. at 447, ¶ 16 (citations omitted).  We do not presume prejudice "without the requisite showing that the jury received and considered extrinsic evidence[.]"  *State v. Nelson*, 229 Ariz. 180, 184, ¶ 12 (2012) (citation omitted).

¶47        To determine whether extrinsic evidence contributed to a verdict, we also consider the following factors:

> 1. whether the prejudicial statement was ambiguously phrased;
>
> 2. whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial;
>
> 3. whether a curative instruction was given or some other step taken to ameliorate the prejudice;
>
> 4. the trial context; and
>
> 5. whether the statement was insufficiently prejudicial given the issues and evidence in the case.

*Hall*, 204 Ariz. at 448, ¶ 19 (citations omitted).  For factor four, we consider:

> whether the material was actually received, and if so, how; the length of time it was available to the jury; the extent to which the jurors discussed and considered it; whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict.

*Id.* (citation omitted).

---

[8] Rule 24.1 applies when jurors inadvertently receive extrinsic evidence.  *See State v. Meehan*, 139 Ariz. 20, 21–22 (App. 1983) (finding the superior court did not abuse its discretion when it granted a motion for a new trial after jurors found and discussed unadmitted "marijuana roaches" inside a coat that had been admitted into evidence).

¶48         Serrato has not shown that the jury received and considered extrinsic evidence. At the motion for a new trial hearing, Serrato's counsel stated, "[W]e simply don't know that the evidence wasn't considered by the jury." Similarly, in his opening brief, Serrato states the jury "presumably opened" the unadmitted envelopes with the scissors provided by the court. Serrato's argument is speculative and does not show the jury received and considered the documents and vials. Moreover, the vials were wrapped in bubble wrap, and the superior court said it did not look like the jurors opened the bubble wrap. Thus, given that it is unknown whether the jurors saw the vials, we cannot presume prejudice.

¶49         Further, the superior court did not abuse its discretion in finding the evidence could not have contributed to the verdict. Serrato argues, "Receipt of unexplained vials in a case without any direct or forensic evidence presumptively prejudices [Serrato]." But the vials were empty, so they did not incriminate Serrato. And multiple witnesses testified that investigators collected samples, but no forensic evidence connected Serrato to the crimes. Empty evidence vials did not contradict that testimony. Thus, the superior court did not err by finding the evidence vials could not have contributed to the verdict.

¶50         Serrato also argues that unadmitted "prejudicial documents" were erroneously given to the jury. Serrato does not identify the documents, nor does he develop his argument for how these documents could have contributed to the verdict. Based on our review, these documents contained Serrato's financial information. The crimes in this case involve theft, so Serrato's financial status is tangentially related to the issues here. But the State's case focused on Serrato's conduct the night Alice was attacked. On this record, we cannot conclude the superior court abused its discretion in finding the documents were "innocuous" and could not have contributed to the guilty verdicts.

¶51         Finally, the factors identified in *Hall* weigh against reversal. Factors one and five concern statements, so they do not apply here. Applying the second factor, the evidence vials confirmed the testimony that investigators collected evidence samples. Factors three and four also weigh against reversal. The superior court took a step to ameliorate any potential prejudice by removing the items from the evidence box and telling the jury that "there might be some items that were in the evidence box that are no longer in the evidence box." There is no evidence that the jury considered the vials or documents. Further, although the jury had access to the items before it rendered its verdicts, the superior court removed the items from the evidence box when it discovered the issue, so the jury only had access

to the items for about a day. Finally, as discussed above, neither the vials nor Serrato's financial documents related to the central issues in the case. Thus, the superior court did not abuse its discretion in determining that the vials and documents could not have contributed to the verdict.

### b. Evidentiary Hearing

**¶52** Serrato also argues that the superior court deprived him of a fair trial and impartial verdict under the Sixth and Fourteenth Amendments to the United States Constitution by not holding an evidentiary hearing. We review the superior court's decision to hold an evidentiary hearing for an abuse of discretion, *State v. Wassenaar*, 215 Ariz. 565, 576, ¶ 48 (App. 2007), and constitutional interpretation issues de novo, *State v. Nordstrom*, 230 Ariz. 110, 114, ¶ 8 (2012). But because Serrato did not ask the superior court to hold an evidentiary hearing, he must show fundamental error. *See Escalante*, 245 Ariz. at 140, ¶ 12. To prevail under fundamental error review, a defendant must show: (1) the superior court erred, and (2) the error was fundamental—meaning the error went to the foundation of the case, took from the defendant a right essential to his defense, or was so egregious that he could not possibly have received a fair trial. *Id.* at 142, ¶ 21. Under the first or second prong, the defendant must also show prejudice, but if he shows the error was so egregious that he could not possibly have received a fair trial, prejudice is presumed. *Id.*

**¶53** Serrato has not shown error, let alone fundamental error. Citing *Sheppard v. Maxwell*, 384 U.S. 333 (1966), *abrogation in part recognized by Jackson v. Houk*, 687 F.3d 723, 733–34 (6th Cir. 2012), Serrato contends that "[t]he [superior] court . . . abused its discretion by not conducting an evidentiary hearing to resolve factual disputes regarding juror exposure to extraneous and prejudicial information." We are unpersuaded. In *Sheppard*, the Supreme Court held that a defendant did not receive a fair trial because of "massive, pervasive and prejudicial publicity that attended his prosecution." *Id.* at 335. Two jurors admitted hearing one "highly inflammatory charge," but "the judge refused defense counsel's other requests that the jurors be asked whether they had read or heard specific prejudicial comment about the case[.]" *Id.* at 357. The Supreme Court concluded that "[i]n these circumstances, we can assume that some of t[he] material reached members of the jury." *Id.* (citation omitted).

**¶54** This case involves no prejudicial publicity allegations. Moreover, we find nothing in *Sheppard* indicating the superior court must sua sponte hold an evidentiary hearing upon every allegation of jury misconduct. *See United States v. Saya*, 247 F.3d 929, 934–35 (9th Cir. 2001)

("An evidentiary hearing is not mandated every time there is an allegation of jury misconduct or bias. Rather, in determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source." (citation omitted)).

¶55        Arizona Supreme Court precedent also maintains the superior court is not required to hold an evidentiary hearing upon every allegation of jury misconduct—even when the defendant requests one. *Compare State v. Miller*, 178 Ariz. 555, 557 (1994) (holding an evidentiary hearing was required when a juror received a communication relating to the "ultimate issue in the case—defendant's guilt or innocence"), *with State v. Spears*, 184 Ariz. 277, 288–89 (1996) (holding an evidentiary hearing was not required when the defendant attached an affidavit from a juror stating "the jury had reviewed the notes of an alternate juror" and considered defendant's failure to testify because the jury's considering defendant's failure to testify was a "vague allegation" and although a court "should err on the side of granting an evidentiary hearing," defendant had not shown actual prejudice arising from the jury's considering the notes).

¶56        Unlike *Miller*, empty evidence vials and Serrato's financial documents did not relate to the "ultimate issue" in Serrato's case. Further, the superior court knew what items were at issue and how long the jury had access to the items. *See Saya*, 247 F.3d at 935 ("'Although it is usually preferable to hold an evidentiary hearing' it is not necessary where 'the court knows the exact scope and nature of the extraneous information.'" (citations omitted)). Finally, it is unclear what an evidentiary hearing would have produced, especially because the superior court is prohibited from receiving testimony or affidavits relating "to the subjective motives or mental processes leading a juror to agree or disagree with the verdict." Ariz. R. Crim. P. 24.1(d). Thus, the superior court did not fundamentally err by not sua sponte conducting an evidentiary hearing.

¶57        Serrato contends that the superior court "interrupt[ed d]efense [c]ounsel's reservations and assertions of possible error then *sua sponte* declar[ed] that the court would not entertain a motion for mistrial or new trial unless [Serrato] was found guilty." Serrato appears to be arguing that the superior court prevented him from addressing the issue. We disagree. The superior court went through the items with the State, Serrato, and Serrato's counsel present and held a hearing on Serrato's motion for a new trial, so Serrato had an opportunity to examine the items and place anything further on the record. Moreover, Serrato's counsel requested the

jury be instructed about the items, the superior court proposed an instruction, and Serrato did not object to the court's proffered instruction.

**CONCLUSION**

¶58      We affirm Serrato's convictions and sentences.

